PRESENT:  All the Justices

EAGLE HARBOR, L.L.C., ET AL.

OPINION BY
v.    Record No. 051543               JUSTICE G. STEVEN AGEE
April 21, 2006
ISLE OF WIGHT COUNTY

FROM THE CIRCUIT COURT OF ISLE OF WIGHT COUNTY
E. Everett Bagnell, Judge

Eagle Harbor, L.L.C. and Founders Pointe, L.L.C. ("the Developers")[1] appeal from the judgment of the Circuit Court of Isle of Wight County which sustained the demurrer of the County of Isle of Wight ("the County") to a bill for declaratory and other relief filed by the Developers, as well as an amended bill, and dismissed the case with prejudice.  For the reasons set forth below, we will affirm the judgment of the trial court.

I.    BACKGROUND AND PROCEEDINGS BELOW

The Developers own several hundred acres of land in the County, part of which is zoned "for development of a mixed-use community" including residential units, and the remainder is "zoned for single-family residential . . . units."  Combined, the Developers have approximately 1,850 residential unit sites,

---

[1] Eagle Harbor owns approximately 567 acres, zoned for up to 1,510 residential units, located on Route 17 in Isle of Wight County. Founders Pointe owns approximately 325 acres in the County, which are zoned for up to 340 single-family residential units.  The Founders Pointe development was commenced by the principals of Eagle Harbor after Eagle Harbor initially contested the sewer and water connection fees at issue in this case.  Eagle Harbor and Founders Pointe will be referenced together as "the Developers" throughout this opinion.

all of which are located in the County's Northern Development Service District ("NDSD"). The County has three separate utility service districts: the NDSD, the Windsor Service District ("WSD"), and the Southern Development Service District ("SDSD").

In 1996, the County's Board of Supervisors ("the Board") enacted ordinances ("the 1996 Ordinances") setting water and sewer connection fees for each residential unit of $3,000 to connect to the County's water system and $3,000 to connect to the County's sewer system. The 1996 Ordinances also provided that "when application for service is made for single family houses in a system totally installed by the developer and conveyed to the County at no cost, the connection fees [would] be reduced by sixty percent (60%)" ("the developer credit"). In 2000, the Board repealed the developer credit.

In 1997, the County issued 25-year General Obligation Water and Sewer Bonds in the amount of $14,250,000 in order to finance improvements to its water and sewer system. Specifically, 45% of the bond proceeds financed improvements to the County's water system in the NDSD and the remainder went to improvements to the County's sewer system in the other two service districts. There were no sewer improvements in the NDSD and no water improvements undertaken in the WSD or the SDSD from the proceeds of the bond issue.

2

In April 2001 the Board commissioned an "internal study of existing water and sewer rates" and utility connection fees. The results of the study ("the County Report") noted that under the 1996 Ordinances, including the repeal of the developer credit, payments on "[t]he average yearly sewer debt of $554,246 would require an average of 185 new sewer connections per year," and "[t]he average yearly water debt of $461,063 would require an average of 154 new water connections per year." The County Report also found that only "100 new water connections and 90 new sewer connections are projected next fiscal year," and concluded that "[b]ased on [the] assumption . . . that there would be the same number of connections per year in the next 25 years, the existing water and sewer connection fees would need to be increased to $4,610 and $6,158 respectively to totally support the existing debt." In September 2001, the Board passed new ordinances increasing the residential water and sewer connection fees to $4,000 each. ("the 2001 Ordinances"). These fees applied to any new residential connection to either system anywhere in the County.

By letter to the County dated August 14, 2003, Eagle Harbor contested the legality of the 2001 Ordinances. Specifically, Eagle Harbor contended that the connection fees were not "fair and reasonable" as required by statute because there was "no reasonable correlation" between the benefits derived from the

3

water and sewer improvement projects funded by the bond proceeds and the fees charged. The letter noted that any new customer connecting to the County systems during the life of the bond issue would be required to pay the fees regardless of whether that customer derived benefit from the improvement projects financed by the bond proceeds. Further, Eagle Harbor pointed out that though "the useful life of the improvements . . . materially exceeds the term of the [b]onds, customers benefiting from those [p]rojects after the [b]onds have been retired bear none of the capital costs associated with them." Eagle Harbor suggested alternative methods of computing the fees that would require connecting customers to pay fees based on the benefit received from the bond issue projects in their utility service district. Eagle Harbor contended that it should pay only a nominal sewer connection fee as it had "paid all the costs of extending sewer" to its property.

By letter of November 20, 2003, Eagle Harbor made a demand pursuant to Code § 15.2-1248, that the County pay $3,848,500, "representing the sum by which land sales within Eagle Harbor, LLC have been impacted by the challenged fees."[2] Founders Pointe made a separate demand on September 10, 2004, for $569,500 in

---

[2] In later demand letters to the County, Eagle Harbor increased its demand as more of its residential units for which it had paid the increased utility fees were sold. By letter of

4

damages for the "imposition of improper and excessive water and sewer connection fees" upon the same basis previously set forth by Eagle Harbor.

Receiving no response from the County, the Developers filed a bill of complaint for declaratory and other relief on September 17, 2004, seeking a determination that the connection fees under the 2001 Ordinances were "unreasonable and contrary to law." They also sought compensation for the difference between the connection fees they paid under the 2001 Ordinances and the level of fees the Developers contended were reasonable and lawful. The Developers did not allege in this pleading, or in the later filed amended bill for declaratory and other relief, that the 2001 Ordinances were actually an improper revenue raising device amounting to an illegal tax, impact fee, or special assessment so as to be void.

In the alternative, the Developers asked the trial court to enter "an injunction requiring the County to refund all water and sewer connection fees illegally charged since September 20, 2001." The Developers appended to their bill of complaint a copy of the County Report and a study conducted by their own expert, Robert C. Dolecki, P.E., evaluating the County's methodology in setting connection fees ("the Dolecki Report").

September 13, 2004, Eagle Harbor alleged its accrued damages had increased to $6,284,600.

5

The County filed a demurrer and a hearing was held by the trial court.  By letter opinion dated March 22, 2005, the trial court found that a "presumption of legislative validity" and therefore, a "presumption of reasonableness" attached to the 2001 Ordinances.   The trial court noted that the standard of review for such an ordinance was whether it was "fairly debatable."  The trial court then opined that under the standard of review "only irrational, arbitrary or capricious action falls outside the 'fairly debatable' standard."  The trial court then concluded that the Developers did not "state[] facts, which if considered true, would establish unreasonableness." Consequently, the trial court ruled the 2001 Ordinances met the "fairly debatable" standard and were thus valid.

As to the Developers' claim under Code § 15.2-2119, the trial court opined that this statute authorizes localities to collect fees from property owners connecting to County utility systems, and the Developers' contention that the 2001 Ordinances were "contrary to law" was without merit.  The trial court's opinion did not specifically address the requirement under Code § 15.2-2119 that sewer and water connection fees must be "fair and reasonable."  The trial court concluded that it would sustain the County's demurrer and dismiss the Developers' bill of complaint.

On April 1, 2005, the Developers moved the trial court for leave to file an amended bill of complaint for declaratory judgment and attached their proposed amended bill to the motion. The facts alleged in the amended bill were essentially the same as in the prior pleading. The Developers alleged they were required as a condition of zoning to connect to County utilities, and they consequently paid over $1,700,000 to extend public water and sewer lines to their developments, which lines have been or will be turned over to the County without charge.

The 2001 Ordinances, along with the repeal of the developer credit, increased the Developers' connection fees per lot from $2,400 to $8,000, and "the imposition of excessive connection fees . . . diminished the value of the [Developers' properties]". While the bond issue financed the NDSD Water Project, the Windsor Sewer Project, the Windsor Boulevard Extension, and the SDSD Sewer Project, approximately 90% of the proceeds were used to extend service to specific areas where County water or sewer service did not previously reach.

The Developers admitted they derived a limited benefit from the NDSD Water Project but contended they received no benefit in return for the sewer connection fee charged by the County. The Developers further alleged that under the 2001 Ordinances, the County did not assess capital costs of the bond issue against those customers benefiting from such projects in proportion to

7

benefits derived, nor did it treat the improvements as enhancements to the system generally and recover the capital costs of the bond issue through regular monthly charges for water and sewer service.

By Order of April 25, 2005, the trial court granted the motion for leave to amend but found that the additional facts alleged in the amended bill had been previously argued by the parties and considered by the court.[3]  The trial court sustained the demurrer to the bill of complaint and the amended bill of complaint and dismissed the Developers' suit with prejudice.  We granted the Developers this appeal.

## II. STANDARD OF REVIEW

"A demurrer tests the legal sufficiency of facts alleged in pleadings, not the strength of proof."  Glazebrook v. Board of Supervisors of Spotsylvania County, 266 Va. 550, 554, 587 S.E.2d 589, 591 (2003) (citations omitted).  To survive a challenge by demurrer, a pleading must be made with "sufficient definiteness to enable the court to find the existence of a legal basis for its judgment." Moore v. Jefferson Hospital, Inc., 208 Va. 438,

---

[3] We agree with the trial court that the amended bill of complaint alleges no "additional facts" which were not "previously argued by the parties [and] considered by the [trial court]."  As the initial and amended bills of complaint were essentially the same and disposition was made by the same order of April 25, 2005, we will hereafter refer to the Developers' pleading as both the bill of complaint and the amended bill of complaint.

8

440, 158 S.E.2d 124, 126 (1967) (internal quotation marks and citations omitted).

In reviewing a trial court's order sustaining a demurrer, "we are required to address the same issue that the trial court addressed, namely whether the amended [bill of complaint] alleged sufficient facts to constitute a foundation in law for the judgment sought." Hubbard v. Dresser, Inc., 271 Va. 117, 119, 624 S.E.2d 1, 2 (2006). We undertake this review de novo, accepting "as true all facts properly pleaded in the bill of complaint and all reasonable and fair inferences that may be drawn from those facts." Glazebrook, 266 Va. at 554, 587 S.E.2d at 591 (citations omitted).

### III. ANALYSIS

The Developers argue in three assignments of error that the trial court erred in sustaining the County's demurrer. They initially argue the trial court erred "by holding that the validity of the fee structure [was] 'fairly debatable' as a matter of law," and instead should have applied the "reasonable correlation" test discussed in McMahon v. City of Virginia Beach, 221 Va. 102, 267 S.E.2d 130 (1980). They also contend that it was error to find the 2001 Ordinances "fairly debatable" and thus "reasonable" as a matter of law in spite of the Developers' factual allegations to the contrary. As such, the Developers argue the trial court was required to take evidence

on the issue and could not sustain the County's demurrer on the record before it.  Finally, the Developers contend that the trial court erred in its consideration of their argument under Code § 15.2-2119 because it disregarded the statutory requirement that connection fees be "fair and reasonable."

The County defends the standard applied in the trial court, arguing that "[i]t is the Board, not [the Developers], that determines an appropriate methodology for calculating connection fees."  Additionally, the County contends that the fees set by the 2001 Ordinances were "fair and reasonable" as required by Code § 15.2-2119 because the fees "were determined by the County on an objective basis," and the "anticipated revenue from those fees is not sufficient to cover the County's utility debt service."  The County also argues there was sufficient evidence placed before the trial court by the Developers to permit a ruling as a matter of law on whether the 2001 Ordinances met the "fairly debatable" standard and therefore sustaining the demurrer was appropriate.

## A. REASONABLE CORRELATION TEST

The Developers' first assignment of error invites this Court to hold that utility connection fees must meet an independent test of validity in that such fees must bear a reasonable correlation to the benefits derived by the property

owner.  The Developers contend we established such a test for utility connection fees in McMahon.  We disagree.

In McMahon, we determined that a locality may "require landowners who possess adequate supplies of potable water provided by their privately owned wells to connect with the municipal water supply" for a fee.  221 Va. at 103, 267 S.E.2d at 131.  We also affirmed the finding of the trial court "that because the charges imposed by the ordinance would not exceed the actual cost to the City of installing the waterlines in the streets in front of the landowners' residences, a reasonable correlation arose between the benefit conferred and the cost exacted."  Id. at 107, 267 Va. at 134.

However, the issue in McMahon, and the other cases cited by the Developers, Tidewater Association of Homebuilders, Inc. v. City of Virginia Beach, 241 Va. 114, 400 S.E.2d 523 (1991), and Mountain View Limited Partnership v. City of Clifton Forge, 256 Va. 304, 504 S.E.2d 371 (1998), was whether the ordinance in question was illegal because it was "an impermissible revenue-producing device" in the form of an invalid special assessment or the like.  The Developers have neither alleged nor argued that the 2001 Ordinances are of that nature.

Our decision in McMahon does not set out a separate "reasonable correlation" test for utility connection fees. Rather, the examination of a municipal fee alleged to be an

11

"impermissible revenue-producing device" focuses on whether "a reasonable correlation arose between the benefit conferred and the cost exacted" to clarify if the levy in question "are fees rather than special assessments." 221 Va. at 107-08, 267 S.E.2d at 133-34. The landowners in McMahon argued that the ordinance requiring the mandatory water connection was not "a valid health measure" but rather "an impermissible revenue-producing device." Id. at 107, 267 S.E.2d at 133. We determined that the ordinance was a public health measure and as such, was a "valid exercise of the City's police power." Id. at 107, 267 S.E.2d at 134. Our observation that there existed "a reasonable correlation . . . between the benefit conferred and the cost exacted" served only to "negate[] the landowners' contention that the ordinance was adopted solely as a revenue measure." Id. at 107-08, 267 S.E.2d at 134.

Our subsequent decisions applying McMahon's reasonable correlation observation were in similar circumstances.[4] In

_____

[4] The Developers urge that our decision in Estes Funeral Home v. Adkins, 266 Va. 297, 586 S.E.2d 162 (2003), supports their position that utility connection fees imposed by a locality are unlawful if there is "no correlation between the rates charged . . . and the cost . . . of providing [the service]." However, the claim in Estes Funeral Home was based on a constitutional argument that the Equal Protection clause prohibited assessing disparate trash collection fees among members of the same customer class. Id. at 302-03, 586 S.E.2d at 165. We agreed that a locality could not charge different fees to similarly situated customers. Id. at 306, 586 S.E.2d at 167. No such claim is made in the case at bar, which involves

12

Tidewater Association of Homebuilders, a group of homebuilders challenged a city ordinance imposing a Water Resource Recovery Fee to recover the capital costs of building a water pipeline. 241 Va. at 117, 400 S.E.2d at 525. The homebuilders alleged "the City had no legal authority to levy and collect the fee, that the fee was an unauthorized tax, and that the timing and amount of the fee were arbitrary and capricious exercises of the City's authority." Id. Specifically, the homebuilders contended that the City acted without authority because the fee was an "impact fee" as defined by former Code § 15.1-498.2,[5] and thus should have been established by statute in order to be valid. Id. at 119-20, 400 S.E.2d at 526. Further, they alleged that the fee was an impermissible tax because there is "no particularized benefit to those who pay the fee." Id. at 120, 400 S.E.2d at 527.

Holding that "the ability to finance the cost of providing [a water system] is inherent in the authority to provide it," this Court determined that the fee was a form of proprietary fee for a particular service. Id. at 119-20, 400 S.E.2d at 526-27. "[W]ithout the [pipeline], new developments or connections to

the mirror opposite of the circumstances reviewed in Estes Funeral Home, because the County here is charging uniform fees among members of the same customer class. Estes Funeral Home therefore has no application in the case at bar.
    [5] This statute is now codified as Code § 15.2-2319.

the existing water system would not have been possible." Id. at 121, 400 S.E.2d at 527. We held that "those who are paying the fee for the new connections . . . are receiving an immediate benefit – access to the present City water system which would be unavailable without the project." Id. Citing McMahon, we noted that because "there was a reasonable correlation between the benefits of the service provided and burdens of the fee paid, . . . the fee was valid and not solely a revenue measure or special assessment." Id.

In Mountain View, apartment complex owners contested the validity of an ordinance nearly doubling refuse collection and disposal fees. 256 Va. at 307, 504 S.E.2d at 373. Specifically, the owners contended that under Tidewater and McMahon, "the fee imposed by the Ordinance was an impermissible tax, because the fee exceeded the actual cost of providing the service and there was no reasonable correlation between the benefit conferred and the burden imposed." Id. at 310, 504 S.E.2d at 374-75. At trial, the City of Clifton Forge presented evidence that the landfill used at the time the higher fees were enacted was set to close and that anticipated expenditures associated with that closing merited the fee increase. Id. at 308-09, 504 S.E.2d at 374.

In explaining our prior holdings in McMahon and Tidewater we observed that: "[W]e merely concluded that since the costs of

14

the planned services exceeded the fees imposed for those services, there was no merit to the contention that either of the ordinances constituted an impermissible tax." Id. at 311, 504 S.E.2d at 375. Based upon this precedent, we determined the challenged ordinance in Mountain View

> is not an invalid revenue-generating device solely because the fee set by the ordinance generates a surplus. The relevant inquiry, as set forth in McMahon and reaffirmed in Tidewater, is whether there is a reasonable correlation between the benefit conferred and the cost exacted by the ordinance.

Id. at 312, 504 S.E.2d at 376.

Our decision in McMahon and its progeny establish that the judicial inquiry as to a reasonable correlation relating to a municipal fee is directed to whether that fee is a bona fide fee-for-service or an "invalid revenue-generating device." Mountain View, 256 Va. at 312, 504 S.E.2d at 376. The reasonable correlation test is not an independent determination of reasonableness in the context of the "fairly debatable" standard applied to the legislative enactment of a local governing body. Instead, it is determinative of whether a fee enacted by a locality is a permissible exercise of its police power as opposed to an impermissible revenue-producing device in the form of a special assessment, impact fee or the like.

In the case at bar, the Developers neither pled nor argued that the 2001 Ordinances enacted fees that constituted an

15

impermissible tax as a special assessment, impact fee, or the like.  Neither do the Developers challenge the County's authority to enact and levy the connection fees as a valid exercise of the County's police powers.  Instead, they contend only that the fees are "unreasonable and contrary to law" as not reasonably related to the benefit conferred on the Developers.  Therefore the "reasonable correlation" test has no application to the 2001 Ordinances, and the trial court did not err by refusing to apply such a review.

### B. CODE § 15.2-2119

This Court has held that "setting rates and fees for sewer or water services is a nondelegable legislative function."  City of South Boston v. Halifax County, 247 Va. 277, 283, 441 S.E.2d 11, 15 (1994); County of York v. King's Villa, Inc., 226 Va. 447, 450, 309 S.E.2d 332, 333 (1983); Armstrong v. County of Henrico, 212 Va. 66, 77, 182 S.E.2d 35, 43 (1971).  Thus, as with any other legislative function, the action of the Board in setting the connection fees is accorded a presumption of validity.  Board of Supervisors v. Robertson, 266 Va. 525, 532, 587 S.E.2d 570, 575 (2003).

The trial court recited the "reasonableness" standard which governs the challenge to an ordinance a local governing body enacts in its legislative capacity:

16

The presumption of legislative validity that attached to the Board's [legislation] is a presumption of reasonableness. Legislative action is reasonable if the matter in issue is fairly debatable. An issue is fairly debatable when the evidence offered in support of the opposing views would lead objective and reasonable persons to reach different conclusions . . . .

We have enunciated the following principles for determining whether the presumption of reasonableness in a given case should prevail or has been overcome:

Where presumptive reasonableness is challenged by probative evidence of unreasonableness, the challenge must be met by some evidence of reasonableness. If evidence of reasonableness is sufficient to make the question fairly debatable, the [legislative action] must be sustained. If not, the evidence of unreasonableness defeats the presumption of reasonableness and the [legislative action] cannot be sustained.

Id. at 532-33, 587 S.E.2d at 575 (citations and internal quotation marks omitted).[6]

Code § 15.2-2119 requires that "[w]ater and sewer connection fees established by any locality shall be fair and reasonable."  The General Assembly has used this language throughout the Code to describe the obligation of authorities

---

[6] The trial court cited Marsh v. City of Richmond, 234 Va. 4, 10, 360 S.E.2d 163, 166-67 (1987) and City of Richmond v. Randall, 215 Va. 506, 511, 211 S.E.2d 56, 60 (1975), for the proposition that "only irrational, arbitrary or capricious action falls outside the 'fairly debatable' standard."  However, in Marsh we did not mention the "fairly debatable" standard, and our decision in Randall echoes the reasoning of Robertson, requiring a weighing of the evidence to determine reasonableness and thus whether the contested issue is "fairly debatable." Randall, 215 Va. at 511-12, 211 S.E.2d at 60.  Thus, the trial court erred in defining "fairly debatable" by focusing on the "irrational, arbitrary or capricious" standard.

and localities charging connection fees and service fees for water, sewer, and wireless communications to charge only fair and reasonable fees.  Code §§ 15.2-2143, -5114(10), -5136(D), -5137(E), -5431.11(9), -5431.25(D); Code §§ 21-118.4(e), -118.5. The legislature, however, declined in each instance to define "fair and reasonable."

The Developers argue that because Code § 15.2-2119 was amended in 1997, adding the "fair and reasonable" language to the statute, the General Assembly created a new standard of review.  They contend a court must independently determine whether a local governing body's fee enactment is "fair and reasonable," not simply whether the issue of a "fair and reasonable" connection fee is "fairly debatable."  We disagree with the Developers.

Prior to its amendment, Code § 15.2-2119[7] did not separately address the right of a locality to assess connection fees.  The 1997 amendments, however, added the pertinent language to the statute that: "Water and sewer connection fees established by any locality shall be <u>fair and reasonable</u>." (Emphasis added).[8] These amendments did not address or change the applicable

_____

[7] Code § 15.1-321 became Code § 15.2-2119 in December of 1997 pursuant to a separate enactment during the same session of General assembly repealing and recodifying former Title 15.1 as Title 15.2.  <u>See</u> 1997 Acts ch. 587.

[8] See 1997 Acts ch. 12 (amending former Code § 15.1-321, now codified as § 15.2-2119).

standard of judicial review used when examining the exercise of the legislative function by a local governing body in adopting a connection fee. Upon evidence that the connection fee is not "fair and reasonable," and corresponding evidence that the adopted fee does meet that standard, the courts' function upon judicial review is to determine if the evidence that the fee is "fair and reasonable" makes the issue "fairly debatable." Application of that standard in this case indicates the trial court did not err in granting the demurrer as to the Code § 15.2-2119 claim.

A public body's statutory obligation to charge "fair and reasonable" fees is a delegation of authority by the General Assembly which includes a certain amount of discretion. See Central Tel. Co. of Va. v. Corporation Comm'n, 219 Va. 863, 874, 252 S.E.2d 575, 581 (1979) (In performance of its statutory mandate to fix "just and reasonable" rates for a public utility, the State Corporation Commission "exercises a legislative function . . . which involves a reasonable amount of discretion."). When the General Assembly permits a governmental entity to act with discretion, without further statutory guidance, we presume that such action is valid and reasonable unless the party disputing the action presents unchallenged evidence of unreasonableness. See Robertson, 266 Va. at 532-33, 587 S.E.2d at 575. Even though the trial court's opinion does

19

not elaborate on the facts weighed on demurrer, the record reflects the trial court considered not only the factual allegations in the Developers' pleadings, but also the facts represented by the documents incorporated into the pleadings: the Dolecki Report and the County Report. See City of Chesapeake v. Cunningham, 268 Va. 624, 633, 604 S.E.2d 420, 426 (2004) ("Where no evidence is taken . . . the trial court, and the appellate court upon review, must rely solely upon the pleadings (which include[] the voluminous attachments in this case) in resolving the issue presented.").

The Developers' pleading, including the Dolecki Report, alleged facts, which if true, arguably constitute "probative evidence" that the fees set by the 2001 Ordinances were not fair and reasonable. For purposes of a demurrer, the Developers showed they extended sewer lines to their properties at their own considerable expense, but then paid the County $7,400,000 in sewer connection fees without receiving any benefit. They also alleged that if the cost of the sewer improvements were divided by the number of property owners connecting to the bond-financed system and receiving benefit therefrom, the actual cost per connection should be $15,000, not $4,000. While the contrast is not as stark regarding water connection fees, the Developers make similar allegations which we must accept as true for purposes of a demurrer. See Arlington Yellow Cab Co. v.

20

<u>Transportation, Inc.</u>, 207 Va. 313, 318-19, 149 S.E.2d 877, 881 (1966).

Taking the facts alleged but not the conclusions of law presented as true for purposes of the demurrer, the Developers set out facts representing the unreasonableness of the connection fees. Unless there were contrasting facts presented of reasonableness, these allegations would be sufficient to survive a demurrer because the issue could not be "fairly debatable." However, by incorporating the County Report in their pleading, the Developers also presented facts showing the reasonableness of the fees to the trial court.

The County Report summarized the Board's policy decisions with regard to financing the County's water and sewer systems:

- Operating expenses should be covered by user fees.
- Capital expenses should be covered by connection fees.

. . . .

- No general fund monies should be used to supplement the Public Utilities budget.

. . . .

[T]he goal of the utility system is to become self sustaining. In order to achieve that goal, the water and sewer connection fees need to be increased to cover the existing debt . . . .

The County Report concluded that in order to meet the policy goal of having a self-sufficient utility system, the water and sewer fees would need to be increased to $4,610 and $6,158,

respectively. Instead of increasing the connection fees to the amount needed to fully support the bond indebtedness, the County raised its connection fees to $4,000 per connection in the 2001 Ordinances.

The Developers' pleading, through the County Report, thus placed before the trial court facts showing that the connection fees established by the 2001 Ordinances were a uniform amount to all new customers countywide, were less than the actual system costs and were solely dedicated to retiring the utility bond issue. The County Report thus presented facts showing that the 2001 Ordinances were fair and reasonable in rebuttal to the allegations of unreasonableness in the pleadings and the Dolecki Report.

The trial court thus had before it facts reflecting that the fees were not "fair and reasonable" and offsetting facts showing that the fees were reasonable as its letter opinion notes: "the facts stated by Eagle Harbor . . . would appear to support the very debatability of the County's enactment of the fees." As such, there was "evidence of reasonableness . . . sufficient to make the question fairly debatable," thus "the legislative action must be sustained." Robertson, 266 Va. at 533, 587 S.E.2d at 575 (internal quotation marks omitted). Accordingly, the trial court did not err in sustaining the

demurrer regarding the Developers' argument under Code § 15.2-2119.

## C. TRIAL COURT'S FAILURE TO HEAR EVIDENCE

The Developers also assign error by contending the trial court had an insufficient evidentiary basis upon which it could sustain the County's demurrer and the trial court therefore could not rule as a matter of law without taking evidence on the issue of reasonableness. The Developers aver that <u>Concerned Taxpayers v. County of Brunswick</u>, 249 Va. 320, 327, 455 S.E.2d 712, 716 (1995), establishes a rule requiring an evidentiary proceeding beyond the pleadings and argue "the trial court must hear and compare the evidence in order to determine whether a legislative action's validity is 'fairly debatable.' "

In many cases, the Developers' argument would be accurate as a practical matter because the facts alleged could not be deemed sufficient to rule as a matter of law at the demurrer stage since there is no venue for a defendant's factual presentation. In evaluating a plaintiff's pleading upon demurrer, the only factual allegations before the court would be those alleged by that pleading. If those factual allegations, deemed true, established the plaintiff's <u>prima</u> <u>facie</u> case and required a rebuttal for determining the merits, the trial court could not act without the taking of evidence.

23

However, in the case at bar, the Developers not only made allegations of fact in their pleading, but enlarged the scope of facts before the trial court by incorporation of the Dolecki Report and the County Report.  As noted earlier, the trial court was entitled to consider these documents in its determination of the demurrer.  See City of Chesapeake, 268 Va. at 633, 604 S.E.2d at 426.

By virtue of the extended nature of the Developers' pleading with the incorporated reports, the trial court was in a unique position in the consideration of the demurrer to have evidence of the purported unreasonable nature beyond the bare allegations in the pleadings as part of the record for decision.  As discussed above, the trial court had facts showing the unreasonable nature of the 2001 Ordinances in the Dolecki Report which was met with facts reflecting reasonableness in the County Report.  The Developers chose to put these facts before the trial court through the structure of their filing and cannot now complain regarding the trial court's consideration of them.  In effect, the Developers presented both sides of the evidentiary issue through their filing which was adequate for the trial court to determine the 2001 Ordinances were "fairly debatable" and resolve the issue on demurrer.  Unlike the parties in Concerned Taxpayers, the Developers here put an adequate

24

evidentiary record before the trial court which, therefore, did not err in ruling without an evidentiary hearing.

## IV. CONCLUSION

For the foregoing reasons, we will affirm the judgment of the trial court sustaining the County's demurrer and dismissing the Developers' bill of complaint and amended bill of complaint with prejudice.

<u>Affirmed</u>.