COURT OF APPEALS OF VIRGINIA

Present:  Chief Judge Decker, Judges Ortiz and Chaney
Argued at Fairfax, Virginia

SCOTT CORZINE, ET AL.

OPINION BY
v.     Record No. 1015-24-4     JUDGE VERNIDA R. CHANEY
FEBRUARY 3, 2026

ALEXANDRIA CITY COUNCIL, ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
Lisa B. Kemler, Judge

Michael J. Finney (Monica T. Monday; Gentry Locke, on briefs), for appellants.

Travis S. MacRae, Senior Assistant City Attorney, for appellees Alexandria City Council and City of Alexandria.

Matthew A. Westover (Brooke N. West; Walsh, Colucci, Lubeley & Walsh, P.C., on brief), for appellees 301 N. Fairfax LLC and 301 N Project Owner LLC.

Scott Corzine and neighboring landowners (collectively, "Owners") appeal the circuit court's judgment dismissing their complaint challenging a development special use permit ("SUP") authorizing a floor area ratio ("FAR")[1] of 2.5 for a wholly residential apartment building in Alexandria's Commercial Residential Mixed Use High ("CRMU-H") zone. This appeal requires this Court, as a matter of first impression, to determine whether Alexandria Zoning Ordinance § 5-305 ("§ 5-305") applies to a wholly residential development seeking additional FAR through an SUP. Since § 5-305 unambiguously permits a wholly residential

---

[1] "FAR" refers to "the relationship between the total amount of a building's usable floor area and the total area of the parcel upon which the building stands." *RECP IV WG Land Investors LLC v. Capital One Bank USA, N.A.*, 295 Va. 268, 272 (2018); *see also* Alexandria Zoning Ordinance § 2-146 (defining FAR as "the total aggregate floor area of such building or buildings divided by the area of that lot or tract of land").

development in a CRMU-H zone with an SUP to authorize a FAR of up to 2.5, the circuit court's judgment is affirmed.

BACKGROUND

The material facts are undisputed. 301 N. Fairfax LLC owns the real property at 301 North Fairfax Street ("Property") in Alexandria, Virginia. On January 20, 2024, the Alexandria City Council approved land use applications submitted by 301 N. Fairfax LLC and 301 N Project Owner LLC (collectively, "301 Appellees") that permitted redevelopment of their property into a 48-unit multifamily residential building ("Project"). Additionally, the City Council rezoned the property from the Commercial Downtown zone to CRMU-H and approved a development SUP authorizing a maximum FAR of 2.5. The Project contained no commercial use.

On February 16, 2024, Owners filed a complaint for declaratory and injunctive relief against the Alexandria City Council ("City Appellees") and the 301 Appellees in the Alexandria Circuit Court. Owners alleged that "[b]y granting a[n] SUP for the [Project] in violation of restrictions set forth in [§] 5-305 of the Zoning Ordinance, the City Council acted outside the scope of its authority, rendering the SUP [authorizing a FAR of 2.5] void *ab initio*." R. 1, 8, 12, 14. They requested that the circuit court "[d]eclare [the] SUP . . . void *ab initio*" and "[e]njoin the City [Council] from issuing any permits for the . . . Project or from taking any further action pursuant to the SUP." R. 12.

In March 2024, City Appellees and 301 Appellees (collectively, Appellees) demurred, arguing that "[Owners'] interpretation of [§ 5-305] is patently wrong."[2] R. 29. According to Appellees, the plain "language of [§ 5-305] permits a [wholly] residential project located in the

---

[2] There are two demurrers by different defendants, but they both focus on the meaning of § 5-305(A). On March 13, 2024, City Appellees demurred. 301 Appellees demurred the following day. The primary contention of both parties' demurrers was that the plain meaning of § 5-305(C) expressly authorized the City Council to grant an SUP to a wholly residential project in the CRMU-H zone with a maximum FAR exceeding 1.5.

CRMU-H zone to have a maximum FAR of 2.5, pursuant to a[n] [SUP]." R. 28-37, 41-44, 58-65. They contended that the proposed Project—a "residential building with [48] apartment units and no commercial uses" in a CRMU-H zone—satisfied the requirements of § 5-305(C) for additional FAR through an SUP. R. 29-30, 101.

On May 10, 2024, in its letter opinion, the circuit court sustained the demurrers and dismissed the complaint with prejudice, finding that the "Council acted within the scope of authority expressly granted by Zoning Ordinance [§] 5-305[.]" R. 81, 100-06. The court found the language of § 5-305 unambiguous and held that the plain meaning governed. R. 104. It concluded that § 5-305(C) applied when there is a "mixed use *or residential* development and a[n] [SUP] is sought to get approval for additional FAR." R. 104. Once "the requirements of Ordinance 5-305(C) are met, a maximum FAR of 2.5 is permitted." R. 104. The circuit court held that the Project satisfied the requirements of § 5-305(C) and that the Council did not exceed its authority in approving the SUP with a maximum FAR of 2.5. This appeal followed.

ANALYSIS

Owners assert two related assignments of error, contending that the circuit court erred by (1) sustaining Appellees' demurrers and dismissing the complaint; and (2) interpreting § 5-305 to permit an SUP authorizing a maximum FAR of 2.5 for a wholly residential project in the CRMU-H zone. The parties agree that the sole issue is whether the circuit court correctly interpreted and applied § 5-305.

"A [circuit] court's decision sustaining a demurrer presents a question of law [that] we review de novo." *Harris v. Kreutzer*, 271 Va. 188, 196 (2006). A demurrer will be granted when the complaint, viewed in the light most favorable to the plaintiff, fails to state a cause of action. *Sullivan v. Jones*, 42 Va. App. 794, 803, 806 (2004). To survive a demurrer, "a pleading must be made with 'sufficient definiteness to enable the court to find the existence of a legal basis for its

judgment.'" *Friends of the Rappahannock v. Caroline Cnty. Bd. of Supervisors*, 286 Va. 38, 44 (2013) (quoting *Eagle Harbor, LLC v. Isle of Wight Cnty.*, 271 Va. 603, 611 (2006)).

"A circuit court's interpretation of a[n] . . . ordinance and its application of that . . . ordinance to the facts of a case are [also] reviewed de novo." *Prince William Bd. of Cnty. Supervisors v. Archie*, 296 Va. 1, 9 (2018); *Berry v. Bd. of Supervisors*, 302 Va. 114, 127 (2023); *see also Alexandria City Council v. Mirant Potomac River, LLC*, 273 Va. 448, 455 (2007) ("Interpretation of a local zoning ordinance, like interpretation of a statute, is a pure question of law, subject to de novo review.").

### I.  Text and Structure of Alexandria Zoning Ordinance § 5-305

"When reviewing the interpretation of a zoning ordinance, the 'words of the ordinance are to be given their plain and natural meaning,' and the 'purpose and intent of the ordinance should be considered[,] but the ordinance should not be extended by interpretation or construction beyond its intended purpose.'" *MAD Props., LLC v. Cnty. of Augusta*, 83 Va. App. 141, 172 (2024) (quoting *Archie*, 296 Va. at 9).  The reviewing court must faithfully apply the ordinance "by giving reasonable effect to every word used." *Antisdel v. Ashby*, 279 Va. 42, 48 (2010); *Patton v. City of Galax*, 269 Va. 219, 229-30 (2005).  In addition, "[t]he plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow or strained construction." *Vollin v. Arlington Cnty. Electoral Bd.*, 216 Va. 674, 679 (1976).  Lastly, "[w]hen interpreting a[n] . . . ordinance, 'our primary objective is to "ascertain and give effect to legislative intent," as expressed by the language used[.]'" *Berry*, 302 Va. at 127 (quoting *Cuccinelli v. Rector & Visitors of the Univ. of Va.*, 283 Va. 420, 425 (2012)).

The interpretation of Alexandria Zoning Ordinance § 5-305 thus begins with its text, which states in relevant part:

**5-305 - Floor area ratio.**

The permitted floor area ratio of a development in the CRMU-H zone depends on whether a single use or mixture of uses is proposed and whether a[n] [SUP] is sought.

> (A) *Single use.* If a parcel is developed for only commercial use or for only residential use, the maximum permitted floor area ratio is:
>
> > (1) Commercial: 1.25, or
> >
> > (2) Residential: 1.25.
> >
> > In the case of either (1) or (2), an additional .25 of retail use is permitted.
>
> (B) *Mixed use.* If a parcel is developed for both commercial and residential use, and the residential use constitutes at least 25 percent of the floor space of the development, the maximum permitted floor area ratio is 1.25 plus an additional .25 of retail use.
>
> (C) *Mixed use or residential/SUP.* If at least 50 percent of the floor space of the proposed development is for residential use and if the commercial use within such a development does not exceed a floor area ratio of 1.25, then, with a[n] [SUP], the maximum permitted floor area ratio may be increased to an amount not to exceed 2.5.

A. *Subsection (A) does not apply to wholly residential projects that meet the requirements of subsection (C) and receive an SUP.*

Owners argue that subsection (A) of § 5-305 governs because the proposed Project—a 48-unit apartment building—is "only residential." They primarily rely on subsection (A)'s language, which provides that "[i]f a parcel is developed . . . for only residential use," the maximum permitted FAR is 1.25. *See* § 5-305(A). According to Owners, because the Project contains "no commercial use," subsection (A)'s FAR limitation controls.

The structure of § 5-305 informs the proper role of subsection (A). The opening sentence of § 5-305 sets the framework, revealing that FAR limits depend on two factors. That sentence

- 5 -

states, "[t]he permitted [FAR] of a development in the CRMU-H zone depends on whether a single use or [a] mixture of uses is proposed and whether a[n] [SUP] is sought." § 5-305. The opening sentence provides a clear roadmap and reflects that determining the appropriate FAR is conditioned on two considerations: (1) the type of use—single or mixed; and (2) whether the applicant seeks an SUP. The ordinance then assigns applicable FAR limits in its subsequent subsections based on those two considerations.

The plain, obvious, and rational meaning of § 5-305 becomes clearer when the structure is considered as a whole and viewed through those two considerations. Subsection (A) applies to single-use developments that do not seek an SUP, limiting the FAR to 1.25. If a single-use development is proposed with a maximum FAR of 1.25, then City Council approval is not required. By contrast, subsection (C) applies when an applicant seeks an SUP to exceed the baseline FAR permitted under subsection (A).[3] The purpose of subsection (C) is thus to enable applicants to seek an SUP for an increased FAR of up to 2.5 in two types of development (mixed use *or* residential) as indicated by its introductory phrase, "*Mixed use or residential/SUP*."[4]

---

[3] As the Supreme Court of Virginia has explained, SUPs allow governing bodies to authorize uses or intensities not permitted as of right, subject to conditions designed to mitigate their impacts on neighboring properties and the public. *See Bd. of Supervisors v. Southland Corp.*, 224 Va. 514, 521-22 (1982).

[4] Owners rely on one of the purposes listed in § 5-301, emphasizing that the CRMU-H zone intends to promote "mixed use projects by allowing greater densities." Thus, Owners suggest that increased FAR via SUP is only for mixed-use, not wholly residential projects.

However, the "purpose" section does not override the plain meaning of § 5-305(C). As discussed above, the italicized phrase "*Mixed use or residential/SUP*" explains which developments are covered by (C) and can have increased FAR depending on the three eligibility criteria.

Owners do not cite the other listed purposes in § 5-301, including "permit[ting] developments that include a mixture or residential, commercial, cultural, and institutional uses in a single structure or multiple but integrated and related structures," and "encourag[ing] a diversification of uses in unified projects located in proximity to metro stations" and the "location of employment and retail centers in proximity to housing." By authorizing the Project here, the City Council arguably furthered the other two stated purposes of the CRMU-H zone.

In this case, subsection (A) does not apply even though the parcel is developed for only "residential use" because Appellees sought an SUP. Once the applicant obtained the SUP, subsection (C) applies, as it provides the mechanism by which the developer can request an increased FAR limit of 2.5.[5] The opening sentence and overall structure of § 5-305 indicate that subsection (C) applies in this case.

### B. *Subsection (C) does not require commercial use.*

Owners further contend that subsection (C) does not apply because the Project includes no commercial use. According to Owners, subsection (C)'s reference to "the commercial use" presupposes the existence of commercial use and therefore excludes wholly residential developments from subsection (C)'s scope.

Appellees respond that Owners' interpretation improperly isolates subsection (A) while disregarding subsection (C)'s text and introductory italicized phrases. Appellees contend that subsection (C) is designed to cap commercial density—not mandate commercial use—and that the conditional phrase "if the commercial use . . . does not exceed" 1.25 merely limits FAR where commercial use is proposed. Appellees also argue that reading subsection (C) to require commercial use contradicts its introductory italicized phrase: "*Mixed use or residential/SUP.*"

We begin with the governing principles of interpretation. Ordinances must be interpreted "by giving reasonable effect to every word used." *Antisdel*, 279 Va. at 48. Courts must construe

---

[5] The structure of § 5-305 reveals that subsection (C) is not a standalone provision as the Owners suggest. Subsections (A) and (B) are meant to apply generally, with no reference to receiving an SUP, but focusing on parcel development. Each starts with "If a parcel is developed . . . the maximum permitted [FAR] is . . . ." However, subsection (C) does not start that way. It begins, "If at least 50 percent of the floor space of the proposed development . . . then, with a[n] [SUP], the maximum permitted [FAR] may be increased to an amount not to exceed 2.5." Subsection (C) therefore already contemplates that a parcel is being developed either for wholly residential or mixed use and is therefore only triggered once there is a mixed-use or residential development proposed, *and* an SUP is sought. It is dependent on subsections (A) and (B) rather than providing a contradiction.

ordinances as a whole, with all parts harmonized as much as possible and "no part . . . considered meaningless unless absolutely necessary." *Bd. of Supervisors v. Cohn*, 296 Va. 465, 473 (2018) (quoting *Davis v. MKR Dev., LLC*, 295 Va. 488, 494 (2018)). Applying those principles, subsection (C)'s text permits application in this case.

Subsection (C) establishes three eligibility criteria for authorizing a FAR of up to 2.5. First, at least 50% of the floor space must be residential. All parties agree that the proposed 48-unit apartment building is 100% residential, so this requirement is met.

Second, subsection (C) sets a commercial FAR ceiling of 1.25. It does not establish a minimum commercial-use requirement; nothing in the text mandates the inclusion of commercial use. By adopting subsection (C)'s first requirement of at least 50% residential floor space, the City Council demonstrated that it knew how to establish a minimum floor space when it intended to do so. *Compare* § 5-406(B)(2) (revealing another instance in which the City Council established a general floor requirement—that 41.8% of the floor space "must be devoted to residential use"); *cf. City of Hampton v. Williamson*, 302 Va. 325, 335 (2023) ("The difference in language between the related statutes is quite telling. [Section] 2.2-3003(e) demonstrates that when the General Assembly intends to create a full-fledged discovery mechanism, it knows how to do so."). The absence of a corresponding minimum FAR in the second requirement of subsection (C) suggests that the omission was deliberate. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012) ("The expression of one thing implies the exclusion of others.").

For this criterion, Owners specifically argue that subsection (C)'s reference to "*the* commercial use" requires the proposed development to include some amount of commercial use. They emphasize that subsection (C) employs the definite article "the," rather than an indefinite article such as "a" or "any," and does not include qualifying language such as "if any."

According to Owners, the phrase "the commercial use" presupposes the existence of commercial use and therefore excludes wholly residential developments from subsection (C)'s scope. In support, Owners cite decisions recognizing that the use of the definite article may signal reference to something already in existence. *See, e.g.*, *Thorsen v. Richmond SPCA*, 292 Va. 257, 265 (2016); *Grafmuller v. Commonwealth*, 57 Va. App. 58, 65-66 (2010).

Although the use of the definite article "the" can, in some contexts, carry interpretive significance, it is not dispositive. As this Court explained in *Grafmuller*, even where the definite article is used, courts must construe the language in light of the statute's structure, purpose, and operative effect. 57 Va. App. at 62, 65-66. In § 5-305(C), the clause, "if the commercial use . . . does not exceed[6] a floor area ratio of 1.25," functions as a conditional limitation, not an existence requirement. It sets a maximum on commercial FAR when commercial use exists; it does not require commercial use to be present. This interpretation aligns with the subsection's purpose: subsection (C) sets a numerical limit on commercial FAR but does not specify a minimum commercial component or a maximum residential percentage.

Here, the Project includes no commercial use, which falls under the maximum permitted by subsection (C). A commercial FAR of 0 does not exceed 1.25. The second eligibility criterion is therefore satisfied. Finally, it is undisputed that the City Council issued an SUP, thus satisfying the third criterion. Accordingly, because all three eligibility criteria under the text of subsection (C) are met, the circuit court did not err in applying that provision.

---

[6] The word "exceed" provides guidance and is defined as "to go beyond a limit set[.]" *Exceed*, *Merriam-Webster Online Dictionary*, https://perma.cc/8YSM-8JP7. Applying the dictionary definition, subsection (C) caps commercial FAR at 1.25 but does not require any minimum commercial use.

## II. Italicized Phrase as an Interpretive Aid

Our interpretation is reinforced by subsection (C)'s introductory phrase, "*Mixed use or residential/SUP*," which provides interpretive context regarding the provision's scope. Owners view the role of subsection (C)'s italicized phrase as limited by characterizing it as a heading or preamble and asserting that it is not part of the operative text. Appellees maintain that the phrase is operative text, not a mere heading, that shapes the subsection's scope. The City Council defines "headings and titles" as "printed in boldface type . . . intended as mere catchwords . . . and [not to be] taken [as] titles of such sections, nor as any part of the section[.]" *See* Alexandria Zoning Ordinance § 1-400(A)(13). Although the phrase "Mixed use or residential/SUP" in § 5-305(C) is italicized—not bolded[7]—we assume without deciding that the phrase is merely a heading.

Even assuming without deciding that the italicized phrase "*Mixed use or residential/SUP*," functions as a mere heading, it may still be considered as an interpretive aid.[8]

---

[7] Section 1-400(A)(13) does not operate as an exclusionary rule. That provision specifies that headings and titles printed in boldface type are intended as mere catchwords and are not part of the operative text. In doing so, it establishes a safe harbor by identifying when text must be treated as non-operative, however it is silent as to whether other text, like italicized phrases, may be considered. Nothing in § 1-400(A)(13) provides that text not printed in boldface must be operative, nor does it require courts to disregard italicized phrases that accompany a provision. It does not foreclose consideration of other text as an interpretive aid where, as here, it does not conflict with the ordinance's plain language.

[8] *Avonlea v. Moritz*, 81 Va. App. 729 (2024), does not advance the Owners' argument. In *Avonlea*, this Court considered whether a subheading—"Location of parking facilities"—could expand the scope of the operative provision that followed. *Id.* at 736 & n.5. The Court held that the subheading could not override the plain meaning of the operative text, which regulated only access to parking and not the location of a structure. *Id. Avonlea* confirms that headings, even when considered, do not control over clear operative language. Here subsection (C)'s text sets forth the conditions under which a development may obtain an increased FAR by SUP. The italicized phrase neither narrows nor expands those conditions, and treating it as a non-operative heading does not change the subsection's plain meaning. Accordingly, even when the phrase "*Mixed use or residential/SUP*" is treated as a mere heading, it does not support Owners' argument that subsection (C) excludes wholly residential developments that received an SUP.

It is well-established that headings may serve as interpretive aids so long as they do not conflict with the operative language of the provision. *See Dubin v. United States*, 599 U.S. 110, 120-21 (2023) (explaining that the "title of a statute and the heading of a section" are "tools available for resolution of doubt" (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998))); *Jones v. Div. of Child Support Enf't ex rel. Owens*, 19 Va. App. 184, 189 (1994) (explaining that headings may serve as a "matter of informative convenience"). Consideration of the italicized introductory phrase does not override or limit the text of § 5-305(C) but instead confirms the scope of applicability that follows from its literal terms.

Owners maintain that a subheading remains "a matter of informative convenience" and suggest that § 5-305(D)'s subheading informs a reader that its body applies to "[c]ontinuum of care facilit[ies]." That subsection reads:

> (D) *Continuum of care facility.* The maximum permitted floor area ratio is 1.5 including .25 of retail use, and a maximum of 50 percent of the floor space of the proposed development may be residential use. Except that, if a[n] [SUP] is approved, the maximum floor area ratio may be increased to an amount not to exceed 2.5 and a maximum of 70 percent of the floor space of the proposed development may be residential use.

§ 5-305(D). Both parties acknowledge that without subsection (D)'s subheading, "*Continuum of care facility*," a reader would not understand the scope of the subsection, as the remaining language only identifies permitted maximum FARs. Although recognizing the value of subsection (D)'s "subheading," Owners simultaneously argue that subsection (C)'s italicized phrase should be disregarded. However, contrary to the Owners' position, when the italicized phrase of § 5-305(C) is treated as a subheading, the result confirms that the circuit court did not err by considering the phrase in its interpretive analysis. Subsection (C) has the same structural pattern as the italicized introductory phrase, "*Mixed use or residential/SUP*," which similarly aids the reader in understanding the scope of the subsection. To treat the italicized introductory

phrase of subsection (D) as informative but insist the parallel italicized introductory phrase in subsection (C) be disregarded would make the interpretation internally inconsistent.

III.  Structural Analysis of Alexandria Zoning Ordinance §§ 5-305 and 1-400(B)(4)

Owners alternatively argue that even if subsection (C) applies, a separate provision of the Zoning Ordinance dictates that if there is a conflict between zoning requirements, the proposed development must "comply with the most restrictive of such requirements."  Alexandria Zoning Ordinance § 1-400(B)(4).  Because subsection (A)'s FAR of 1.25 is "more restrictive," Owners contend that it should control over subsection (C).  Owners, therefore, fault the circuit court for failing to apply § 1-400(B)(4) in light of the perceived conflict between subsections (A) and (C).

Appellees respond that subsections (A) and (C) do not conflict, concluding that "[w]hen the overall structure and intent of the Ordinance are considered together with its plain words, these subsections can be read in harmony and simply apply to different situations: (A) applies if the development is solely residential without a[n] SUP and (C) applies if a[n] SUP is approved."

Under well-established principles of construction, courts should "interpret the several parts of a statute as a consistent and harmonious whole . . . to effectuate the legislative goal." *Cohn*, 296 Va. at 473 (quoting *Cuccinelli*, 283 Va. at 425); Scalia & Garner, *supra*, at 180 ("[T]he provisions of a text should be interpreted in a way that renders them compatible, not contradictory[.]"); *see also Ainslie v. Inman*, 265 Va. 347, 353 (2003) ("When a given controversy involves a number or related statutes, they should be read and construed together to give full meaning, force, and effect to each."); *Hulcher v. Commonwealth*, 39 Va. App. 601, 605 (2003) ("Proper construction seeks to harmonize the provisions of a statute both internally and in relation to other statutes.").

The structure of § 5-305 confirms that no conflict exists, rendering the "most-restrictive rule" of § 1-400(B)(4) inapplicable.[9] When read together, there is no conflict because if an SUP is sought for a mixed-use or residential development, subsection (C) governs. If no SUP is sought, then the general subsection (A) applies to single-use developments, while subsection (B) applies to mixed-use developments. Read naturally, these subsections are sequential, non-conflicting, and applicable to different situations.

CONCLUSION

Accordingly, the circuit court correctly interpreted and applied Alexandria Zoning Ordinance § 5-305(C) to permit a wholly residential development that received an SUP, authorizing a maximum permitted FAR of 2.5. This Court thus affirms the circuit court's judgment.

*Affirmed.*

---

[9] That provision states: "[i]n the case of a conflict among various zone requirements, such as density, lot size, height and floor area ratio, permitted development shall comply with the most restrictive of such requirements." § 1-400(B)(4).