Present: Kinser, C.J., Millette, Mims, McClanahan, and Powell, JJ., and Russell and Koontz, S.JJ.

ELIZABETH RIVER CROSSINGS OPCO, LLC

v. Record No. 130954                    OPINION BY
                                        JUSTICE LEROY F. MILLETTE, JR.
DANNY MEEKS, ET AL.                     October 31, 2013

VIRGINIA DEPARTMENT OF TRANSPORTATION

v. Record No. 130955

DANNY MEEKS, ET AL.


FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
James A. Cales, Jr., Judge Designate

In this appeal we hold that the General Assembly did not unconstitutionally delegate its power of taxation to the Virginia Department of Transportation ("VDOT") and Elizabeth River Crossings OpCo, LLC ("ERC") under the terms of the Public-Private Transportation Act of 1995, Code § 56-556 et seq. ("PPTA"), and that the Comprehensive Agreement between VDOT and ERC does not abridge the Commonwealth's police power.

I. Facts and Proceedings

A.    History of Tunnels Crossing the Elizabeth River

A branch of the Elizabeth River separates the City of Portsmouth from the City of Norfolk. The first tunnel crossing the Elizabeth River between Portsmouth and Norfolk was the two-lane Downtown Tunnel, which opened in 1952. The Downtown Tunnel experienced "steadily increasing traffic . . . at levels

substantially higher than those originally projected."  In response, the General Assembly authorized the construction of an additional crossing in 1956.  The Midtown Tunnel was subsequently built a short distance northwest of the Downtown Tunnel and was opened in 1962.  By 1973, the General Assembly was made aware that traffic through the Downtown Tunnel had reached capacity, with substantial congestion being commonplace and likely to get worse.  Further, the Midtown Tunnel was projected to reach capacity within a few years.  The Downtown Tunnel was therefore expanded so that a second, two-lane tube, parallel to the original two-lane tube, was opened in 1987.

Despite these earlier projects, traffic crossing the Elizabeth River remained a substantial problem.  In 1996, a Final Environmental Impact Statement submitted by the United States Department of Transportation and VDOT noted that transportation projects completed within the region have not "lessen[ed] or alleviate[d] traffic congestion within the project area."  The Final Environmental Impact Statement went on to recognize that a proposed project to "improve traffic movement between Portsmouth and Norfolk at the Midtown Tunnel crossing and to alleviate long traffic queues and delays which currently exist" would "result in significant benefits to the local and regional transportation network."

By 2009, the General Assembly recognized the Midtown Tunnel to be the "most heavily traveled two-lane road" in all of Virginia, creating "both safety and congestion problems." The General Assembly learned that during peak hours both the Downtown Tunnel and the Midtown Tunnel experience the worst possible levels of congestion, with traffic backups that extend more than two miles.

Although other alternatives were initially explored, the next project to address this continuing problem of traffic crossing the Elizabeth River arose under the framework of the PPTA.

B.    The Public-Private Transportation Act

The General Assembly enacted the PPTA in 1995[1] to allow "private entities to develop and/or operate one or more transportation facilities . . . in a more timely, more efficient, or less costly fashion, thereby serving the public safety and welfare."  Code § 56-558(A)(3).  In enacting the PPTA, the General Assembly was motivated by "a public need for timely development and/or operation of transportation facilities."  Code § 56-558(A)(1).  The General Assembly indicated that the development and operation of transportation facilities would meet the public's needs by "improving safety,

---

[1]   The PPTA was amended and re-enacted on July 1, 2005. 2005 Acts chs. 504, 562.

3

reducing congestion, increasing capacity, and/or enhancing economic efficiency."  Id.  The General Assembly recognized that the PPTA was necessary because these public needs would "not be wholly satisfied by existing methods of procurement in which qualifying transportation facilities are developed and/or operated[, or] by existing ways in which transportation facilities are developed and/or operated."  Code § 56-558(A)(1)-(2).

Under the terms of the PPTA, a "public entity that is an agency or institution of the Commonwealth" may accept proposals from private entities "to develop and/or operate a transportation facility."  Code § 56-559(A)-(B).  The public entity may approve a private entity's proposal only after the private entity provides statutorily-specified material and information to the public entity.  Code § 56-560(A).  Once this material and information is submitted, the public entity may approve "the development and/or operation of the transportation facility or facilities as a qualifying transportation facility."  Code § 56-560(C).

However, such approval is dependent upon the public entity determining that such development and/or operation of the transportation facility "serves the public purpose of [the PPTA]."  Id.  The development and/or operation of the transportation facility or facilities serves the public purpose

4

of the PPTA if: "[t]here is a public need for the transportation facility or facilities;" "the transportation facility or facilities . . . are, in the opinion of the . . . public entity, reasonable and will address the needs identified in the . . . transportation plan by improving safety, reducing congestion, increasing capacity, and/or enhancing economic efficiency;" "[t]he estimated cost of developing and/or operating the transportation facility or facilities is reasonable in relation to similar facilities;" and "[t]he private entity's plans will result in the timely development and/or operation of the transportation facility or facilities or their more efficient operation."  Code § 56-560(C)(1)-(4).

The PPTA also requires the public entity to "develop guidelines that establish the process for the acceptance and review of a proposal from a private entity," Code § 56-560(D), and adopt guidelines "that are consistent with procurement through 'competitive sealed bidding,'" Code § 56-573.1(1).

Once the public entity selects a private entity's proposal under the PPTA, but before development or operation of the qualifying transportation facility begins, the public and private entities must enter into a comprehensive agreement. Code § 56-566(A).  The comprehensive agreement shall provide the basic terms of the cooperative agreement between the public entity and private entity.  Code § 56-566(A)(1)-(10).  The

5

comprehensive agreement shall also include a provision for user fees, set forth the duties and obligations of the private entity, and provide for the distribution of any earnings in excess of the negotiated maximum rate of return as negotiated in the agreement.  Code § 56-566(B), (D), (E).  Finally, upon request by a member of the public, the private entity shall make available a "schedule of the current user fees."  Code § 56-566(B).

C.   The Project: The Downtown Tunnel / Midtown Tunnel / MLK Extension

In the 2007 Acts of Assembly, the General Assembly created the Hampton Roads Transportation Authority "as a political subdivision of the Commonwealth" and named it a "responsible public entity as defined in the [PPTA]."  2007 Acts ch. 896. The General Assembly gave the Transportation Authority the authority to "impose and collect tolls in amounts established by the [Transportation] Authority for the use of any new or improved highway, bridge, tunnel, or transportation facility to increase capacity on such facility."  Id.  Additionally, the General Assembly allowed the "Midtown and Downtown tunnels located within the Cities of Norfolk and Portsmouth" to be "tolled if improvements are made to either tunnel."  Id.

The General Assembly directed the Transportation Authority to "phase construction of the transportation projects that are

6

included in the federally mandated 2030 Regional Transportation Plan."  Id.  The "Downtown Tunnel / Midtown Tunnel / MLK Extension" project (the "Project") was one of the first phase projects that the Transportation Authority was directed to pursue.  Id.  The Project is the subject of the current litigation before this Court.

In 2008, VDOT, an agency of the Commonwealth of Virginia, and thus a "public entity," requested conceptual proposals from private entities for financing, design, construction, operation, and maintenance of the Project under the PPTA.  ERC, a "private entity," responded to this request by submitting such a proposal.  ERC's proposal for the Project was accepted for further consideration and was reviewed and approved by an independent review panel in accordance with the PPTA.  See Code § 56-560(C).

In 2009, the General Assembly dissolved the Transportation Authority and transferred its "power to impose and collect tolls for the use of highways, bridges, and tunnels [to] the Commonwealth Transportation Board."  Acts 2009 ch. 864, § 4. The Commonwealth Transportation Board, under a recommendation by the independent review panel, adopted a resolution to continue pursuing ERC's proposal.

On December 5, 2011, VDOT and ERC entered into a final comprehensive agreement (the "Comprehensive Agreement").  The

Commonwealth Transportation Board affirmed the Project and specifically approved and ratified the imposition and collection of tolls on the Project as contemplated by the Comprehensive Agreement.

Pursuant to the Comprehensive Agreement, the Project provides for the design and construction of a new Midtown Tunnel. This new Midtown Tunnel will pass under the Elizabeth River between Portsmouth and Norfolk, and is located next to the existing Midtown Tunnel. The Project also includes the design and construction of the Martin Luther King Freeway Extension (the "MLK Extension"), which would connect State Route 164 to Interstate 264 and provide alternative access routes to the Midtown and Downtown Tunnels. Finally, the Project includes continual maintenance of the existing Midtown and Downtown Tunnels for 58 years.

The Comprehensive Agreement grants ERC the authority to construct, maintain, and operate the facilities for a 58-year period. However, the Commonwealth retains ownership of all of the facilities involved in the Project. The total cost for completing the Project is estimated to exceed $2.04 billion dollars. Funding for the Project comes from federal and state loans, a large investment from ERC, direct payments from the Commonwealth, and tolls from users of the facilities. Included within the Comprehensive Agreement are VDOT's findings,

concluding that "the estimated cost of developing, designing, operating and maintaining the Project is reasonable in relation to similar transportation facilities."  Tolls are scheduled to commence on February 1, 2014.

D.  The Litigation

On July 12, 2012, Danny Meeks, along with other residents of the City of Portsmouth and longtime users of the Downtown Tunnel ("Meeks"), filed a complaint against ERC and VDOT in the Circuit Court for the City of Portsmouth.  ERC removed the case to the United States District Court for the Eastern District of Virginia with VDOT's consent, but the case was subsequently remanded after Meeks filed an amended complaint that omitted the only federal claim.  The amended complaint contains six counts:

> (1) [T]hat the General Assembly has unlawfully delegated its legislative power in violation of Article IV, § 1 of the Constitution of Virginia;
>
> (2) that the General Assembly has violated Article IV, § 14, cl. 7 of the Constitution of Virginia by authorizing a state agency to grant a special tax exemption to a private party;
>
> (3) that the General Assembly has violated Article IV, § 14, cl. 8 of the Constitution of Virginia by authorizing a state agency to agree to diminish a private party's obligation to the Commonwealth and its local governments;

9

(4) that the General Assembly has violated Article IV, § 14, cl. 9 of the Constitution of Virginia by authorizing a state agency to grant a special refund of state and local taxes to a private party;

(5) that [VDOT] lacked authority to execute the [Comprehensive Agreement] with [ERC]; and

(6) that tolls, penalties, and surcharges authorized by the [Comprehensive Agreement] between [VDOT and ERC] violate the Due Process Clause of Article I, § 11 of the Constitution of Virginia.

The parties agreed that the case should be decided on cross-motions for summary judgment on a stipulated record. In its final order, the circuit court dismissed Counts 3 through 5 without prejudice. Count 6 was dismissed with prejudice.

The circuit court found in favor of Meeks on Counts 1 and 2. It granted Meeks' motion for summary judgment on Counts 1 and 2, ruling that the General Assembly "exceeded its authority" by: (1) "ceding the setting of toll rates and taxes in the circumstances of this case for the use of facilities that have been bundled solely for revenue-producing purposes in violation of Article IV, § 1 of the Constitution of Virginia," and (2) giving "unfettered power to [VDOT] to set toll rates without any real or meaningful parameters in violation of Article IV, § 1 of the Constitution of Virginia." Final judgment was entered on May 21, 2013. The circuit court also denied VDOT and ERC's motion for a stay pending appeal, holding

that VDOT and ERC would suffer no irreparable harm absent an appeal, and that "damage to [Meeks] and the public interest . . . . far outweighs any damage to the [Commonwealth]."

VDOT and ERC filed petitions for appeal, and the Court granted review of the following issues: (1) whether the toll fees imposed on users of the Midtown Tunnel, Downtown Tunnel, and MLK Extension are taxes; (2) whether the General Assembly has, through its enactment of the PPTA, unconstitutionally delegated its power of taxation to VDOT and ERC in violation of Article IV, § 1 of the Constitution of Virginia; and (3) whether the circuit court erred in denying VDOT and ERC's request for a stay pending appeal.  The Court also granted review of Meeks' assignments of cross-error, which include the following issues: (1) whether the PPTA unconstitutionally delegates the authority to set toll rates, an exclusively legislative function, to VDOT, and (2) whether the Comprehensive Agreement unconstitutionally abridges the General Assembly's police power and the sovereignty of the Commonwealth.

## II.  Discussion

A.  Standard of Review

In an appeal "aris[ing] from the grant of a motion for summary judgment . . . , we will review the application of law to undisputed fact de novo."  Transportation Insurance Co. v.

Womack, 284 Va. 563, 567, 733 S.E.2d 656, 658 (2012) (internal quotation marks omitted).

In reviewing the constitutionality of a statute "our determination of legislative intent is guided by the recognition that all actions of the General Assembly are presumed to be constitutional." Montgomery Cnty. v. Virginia Dep't of Rail & Pub. Transp., 282 Va. 422, 435, 719 S.E.2d 294, 300 (2011) (internal quotation marks omitted). "There is . . . no stronger presumption known to the law." Id. Accordingly, "only where the statute in issue is 'plainly repugnant' to a constitutional provision will we declare it null and void." Jamerson v. Womack, 244 Va. 506, 510, 423 S.E.2d 180, 182 (1992) (internal quotation marks omitted).

B.   Whether the Circuit Court Erred in Holding that Tolls are Taxes Rather than Valid User Fees

VDOT and ERC assign error to the circuit court's finding that tolls on the Midtown Tunnel, Downtown Tunnel, and MLK Extension are taxes, rather than valid user fees. They claim that the tolls are user fees because they constitute a contractual payment by users of the Midtown Tunnel, Downtown Tunnel, and MLK Extension in exchange for use of the integrated transportation network that the facilities create. VDOT and ERC argue further that the tolls do not constitute taxes because all revenue from the tolls goes to the integrated

12

transportation network and does not fund unrelated projects or purposes.

Meeks contends that the Project tolls are a tax because their primary purpose is to raise revenue. Meeks challenges VDOT and ERC's argument that the Project tolls are voluntary contractual payments in exchange for a particularized benefit, arguing that the payments cannot be voluntary because there are no reasonable travel alternatives for users of the Midtown and Downtown Tunnels. Meeks also contends that the Midtown Tunnel, Downtown Tunnel, and MLK Extension do not constitute an integrated transportation network because each facility is located at least two miles from the others, and because the Downtown Tunnel was added to the Project solely as a means of increasing toll revenue.

We disagree with Meeks and find that the circuit court erred in holding that the tolls at issue are taxes. We have previously held that a tax is "an enforced contribution imposed by the government for governmental purposes or public needs." Westbrook, Inc. v. Town of Falls Church, 185 Va. 577, 582, 39 S.E.2d 277, 280 (1946). "Taxes are levied for the support of government, and their amount is regulated by its necessities." Sands v. Manistee River Improvement Co., 123 U.S. 288, 294 (1887).

In contrast, tolls are user fees when they are "nothing more than an authorized charge for the use of a special facility."  Hampton Roads Sanitation Dist. Comm. v. Smith, 193 Va. 371, 378, 68 S.E.2d 497, 501 (1952); see also Sands, 123 U.S. at 294 ("Tolls are the compensation for the use of another's property, or of improvements made by him.").

In the present case, the tolls paid by users of the Project facilities are user fees because: (1) the toll road users pay the tolls in exchange for a particularized benefit not shared by the general public, (2) drivers are not compelled by government to pay the tolls or accept the benefits of the Project facilities, and (3) the tolls are collected solely to fund the Project, not to raise general revenues.  See Murphy v. Massachusetts Turnpike Auth., 971 N.E.2d 231, 236 (Mass. 2012) (applying a similar test to determine whether tolls are taxes or user fees).

1.  The Tolls Provide a Particularized Benefit to Users of the Project Facilities

Project facility users pay tolls in exchange for a particularized benefit.  As detailed in VDOT's Project Management Plan, VDOT and ERC will use toll revenues to make improvements to each individual Project facility.  Tolls will fund significant improvements to the Midtown Tunnel, including "new roadways, drainage, communications/intelligent

14

transportation systems, lighting, flood protection, fire detection and suppression, ventilation, and power control systems."  The improvements will reduce congestion on, and provide greater emergency access to, the Midtown Tunnel.  The toll revenues will also help fund construction of the MLK Extension, which will "provide improved access to and from West Norfolk and [will] serve as an alternate route for I-264 traffic when the Downtown Tunnel is congested."  Users of the Downtown Tunnel will benefit from "modifications to the existing northbound and southbound tunnels necessary for the existing facility to conform to the National Fire Protection Standard 502."  These modifications include "upgrades to: the existing water supply, ventilation, electrical, and emergency response systems."

Improvements to the individual facilities will also benefit the integrated transportation network as a whole.  The General Assembly has recognized vehicular connections between Portsmouth and Norfolk by bridge or tunnel as an integrated network since 1942 when it enacted the Elizabeth River Tunnel Revenue Bond Act ("Elizabeth River Act").  1942 Acts ch. 130. The Elizabeth River Act granted the Elizabeth River Tunnel Commission the authority to "establish, construct, operate, and maintain the project."  Id. (emphasis added).  The project was defined as "a tunnel or tunnels under the Elizabeth River or a

15

bridge over and a tunnel under the South Branch of the Elizabeth River and a tunnel under or a bridge over the East Branch of the Elizabeth River, <u>forming a vehicular connection between the cities of Portsmouth and Norfolk, Virginia</u>."  <u>Id.</u> (emphasis added).

In 1952, the Downtown Tunnel was constructed as part of the "project."  Several years later, in 1956, the General Assembly approved the construction of another tunnel, the Midtown Tunnel, which the General Assembly explicitly added to the Elizabeth River Act's definition of "project."  Acts 1956 ch. 285.  In 1971, the General Assembly recognized the need for a third vehicular connection between Portsmouth and Norfolk. It authorized the Elizabeth River Tunnel Commission to construct "a tunnel or tunnels or a bridge or bridges under or over the Elizabeth River and any tributaries thereof and approaches and approach roads . . . thereto."  Acts 1971 ch. 237.  The General Assembly again expanded the Elizabeth River Act's definition of "project" to include any of the aforementioned additional vehicular connections.  <u>Id.</u>  Thus, the General Assembly has historically recognized vehicular connections between Portsmouth and Norfolk and approaches to the connections as an integrated network and unified project.

The Project at issue, although created under the later-enacted PPTA, is merely a new adaption of the historically

16

recognized unified project. A 1996 Final Environmental Impact Statement indicates that new improvements to the Project facilities will provide benefits to the Project as a whole, including "improved overall traffic flow, an increase in traffic capacity, and a decrease in travel time." The Official Offering Statement of the Virginia Small Business Financing Authority specifies that these improvements will also "accommodate growing regional traffic volumes, reduce congestion and provide improved links between employment centers, airports, freight, marine terminals, rail lines and other existing transit facilities by providing increased capacity for crossing the Elizabeth River and also by improving linkage to the regional highway system." The users of each of the Project facilities will, by paying the toll, gain a particularized benefit from improvements to the particular facility to which the toll payment provides access, as well as from improvements to the Project as a whole.

2. Drivers Are Not Compelled by Government to Pay the Tolls or Accept the Benefits of the Project Facilities

The government does not compel those who cross the Elizabeth River to pay a toll or accept the benefits provided by the Project facilities. Project facility users' toll payments are therefore voluntary. There are two aspects of voluntariness in the case at bar. First, there are reasonable

17

alternative routes of passage between Portsmouth and Norfolk available to users of the Downtown Tunnel and Midtown Tunnel. Reasonable alternatives include the Gilmerton Bridge and the High Rise Bridge, neither of which impose a toll on users.

Second, because drivers who choose not to use the toll roads do not receive the aforementioned benefits of the Project, they are not compelled to accept the benefit of a fee that they are not paying. This is in contrast to a tax, such as a sales tax, in which the individual purchaser's decision regarding whether to purchase the item has no effect on whether the purchaser will receive a benefit from sales taxes through government services supported by the sales taxes. Even though the purchaser's payment of the sales tax may be voluntary, receipt of the benefit is not.

The user of a toll road, on the other hand, pays a user fee in exchange for a direct benefit that the user would give up if he did not pay the fee. National Cable Television Ass'n v. United States, 415 U.S. 336, 340-41 (1974) ("A fee . . . is incident to a voluntary act [which] bestows a benefit on the applicant, not shared by other members of society"). The government does not compel either the payment or the benefit, and thus the fee is voluntary and contractual.

## 3. The Tolls Are Collected Solely to Fund the Project

Finally, the tolls are collected solely to fund the Project. We have previously held that an ordinance "is not an invalid revenue-generating device solely because the fee set by the ordinance generates a surplus."[2] Mountain View Ltd. P'ship v. City of Clifton Forge, 256 Va. 304, 312, 504 S.E.2d 371, 376 (1998). Rather, the ordinance constitutes an invalid revenue-generating device if there is no "reasonable correlation between the benefit conferred and the cost exacted by the ordinance." Id. In the present case, the costs of the Project exceed the fees imposed on users of the Project facilities and, consequently, the tolls are not an invalid revenue-generating device.

Moreover, the Comprehensive Agreement restricts the use of toll revenues to funding of the Project. Section 5.06 of the Comprehensive Agreement provides that "[ERC] will have no right to use Gross Revenues to pay any debt, obligation or liability unrelated to this Agreement, the Project, or [ERC's] services pursuant to this Agreement." If ERC were to attempt to use revenues from the Project for separate, unrelated purposes by "imposing tolls in excess of that permitted pursuant to [the

---

[2] Tolls for the funding of a project are user fees when they fund not only the project's cost, but also "the return which such values or expenditures should yield." Sands, 123 U.S. at 294.

Comprehensive] Agreement," the Comprehensive Agreement provides
that:

> such . . . Default will be curable only by
> (i) reinstating the tolls in effect
> immediately prior to the impermissible raise
> in tolls, unless waived by [VDOT] and (ii)
> <u>disgorging to [VDOT] any and all increases</u>
> <u>in Toll Revenues that would not have been</u>
> <u>realized in the absence of such [ERC]</u>
> <u>Default</u>, together with interest thereon at
> the Bank Rate from the date of collection
> until the date disgorged.

Section 19.02(d) (emphasis added).

Any disgorgement to VDOT under Section 19.02 of the
Comprehensive Agreement does not remain with VDOT, nor is it
dispersed to unrelated projects.  Rather, the Code provides that
any excess would be diverted to the Transportation Trust Fund.
Code § 33.1-23.03:1(9).  Funds provided to the Transportation
Trust Fund from facilities developed under the PPTA are "held in
a separate subaccount" in the Transportation Trust Fund and are
to be used only to:

> 1. Pay or finance all or part of the costs of
>    programs or projects . . . that are
>    reasonably related to or benefit the users
>    of the <u>qualifying transportation facility</u>
>    <u>that was the subject of a concession</u>
>    <u>pursuant to the [PPTA]</u>.
>
>                     . . . .
>
> 2. Repay funds from the Toll Facilities
>    Revolving Account or the Transportation
>    Partnership Opportunity Fund[, or]

20

            3. Pay the Board's reasonable costs and
               expenses incurred in the administration and
               management of the account.

Code § 33.1-23.03:9(A)-(B) (emphasis added).  The record is

therefore sufficient to establish that all revenue derived from

Project tolls would fund the Project.

     Accordingly, we hold that tolls on the Midtown Tunnel,

Downtown Tunnel, and MLK Extension, which are (1) paid in

exchange for a particularized benefit, (2) not compelled by

government, and (3) collected solely to fund the Project are

user fees, not taxes.

C.    Whether the General Assembly Unconstitutionally Delegated
      the Authority to Set Toll Rates to Public and Private
      Entities in the PPTA

     Meeks assigns cross-error to the circuit court's refusal

to enter summary judgment in his favor on Counts 1 and 2 of the

Complaint for the alternative reason that the PPTA

unconstitutionally delegates to public and private entities the

General Assembly's authority to set toll rates.  Meeks argues

that the PPTA violates Article IV, § 1 of the Constitution of

Virginia because it authorizes public and private entities to

set toll rates on the same project from which the private

entity will derive a return on its investment.  Article IV, § 1

provides, "[t]he legislative power of the Commonwealth shall be

vested in a General Assembly, which shall consist of a Senate

and House of Delegates."  Meeks contends that the ratemaking at

                              21

issue is a wholly legislative function within the jurisdiction of the State Corporation Commission ("SCC"). Meeks argues that the PPTA impermissibly delegates ratemaking authority to VDOT, a state agency that lacks true legislative power.

We disagree. The SCC does not hold regulatory authority over toll rate setting in projects authorized by the PPTA. It is well established that the SCC "has no inherent power simply because it was created by the Virginia Constitution; and therefore its jurisdiction must be found either in constitutional grants or in statutes which do not contravene that document." VYVX of Va., Inc. v. Cassell, 258 Va. 276, 290, 519 S.E.2d 124, 131 (1999) (internal quotation marks omitted). Neither the Constitution nor the Code provides the SCC with jurisdiction over toll rate setting for the Project.

Section 156(b) of Article XII of the Constitution of Virginia of 1902[3] clearly and unambiguously delegated regulatory

---

[3] Section 156(b) provided, in relevant part:

> The [SCC] shall have the power, and be charged with the duty, of supervising, regulating and controlling all transportation and transmission companies doing business in this State, in all matters relating to the performance of their public duties and their charges therefor, and of correcting abuses therein by such companies; and to that end the [SCC] shall, from time to time, prescribe, and enforce against such companies, in the manner hereinafter authorized, such rates, charges,

authority over "transportation . . . companies doing business" in the Commonwealth to the SCC.  Thus, if it were still in effect, Section 156(b) of the Constitution of Virginia of 1902 would have placed ERC, a transportation company doing business in the Commonwealth, within the jurisdiction of the SCC's constitutionally delegated authority.

However, in 1971, the General Assembly enacted the present Constitution of Virginia through a complete revision of its predecessor, the Constitution of Virginia of 1902.  With this change, Section 156(b) of the Constitution of Virginia of 1902 became Article IX, § 2 of the present Constitution of Virginia of 1971, which currently provides, in relevant part:

> Subject to such criteria and other requirements as may be prescribed by law, the [SCC] shall have the power and be charged with the duty of regulating the rates, charges, and services and, except as may be otherwise authorized by this Constitution or by general law, the facilities of railroad, telephone, gas, and electric companies.

> classifications of traffic, and rules and regulations, and shall require them to establish and maintain all such public service, facilities and conveniences, as may be reasonable and just, which said rates, charges, classifications, rules, regulations and requirements, the [SCC] may, from time to time, alter or amend.

(Emphasis added.)

23

(Emphasis added.)  When the "words [and] terms" of a provision of the Constitution are not "doubtful or ambiguous," "we are limited to the language of the section itself and are not at liberty to search for meaning, intent or purpose beyond the instrument."  Harrison v. Day, 200 Va. 439, 448, 106 S.E.2d 636, 644 (1959).  Article IX, § 2 delegates jurisdiction over rates, charges, and services of railroad, telephone, gas, and electric facilities to the SCC.  This list of facilities is exclusive. Thus, with the enactment of the present Constitution of Virginia in 1971, the facilities within the SCC's regulatory authority no longer include "transportation . . . companies doing business in this State."

Just as the Constitution of Virginia does not delegate jurisdiction over transportation companies to the SCC, neither has the General Assembly delegated such jurisdiction over the Project to the SCC.  The authority to authorize and regulate toll roads throughout the Commonwealth is addressed in the Virginia Highway Corporation Act of 1988, Code § 56-535 et seq. ("VHCA") and in the PPTA.

The VHCA provides that "[n]o person may construct, operate[,] or enlarge any [privately owned or operated highway for which a toll is imposed] without first having obtained a certificate of authority from the [SCC] authorizing such construction, operation[,] or enlargement."  Code § 56-538; see

24

also Code §§ 56-536, 56-542.  Thus, the VHCA granted the SCC the authority to authorize and regulate toll roads throughout the Commonwealth.

However, the PPTA, enacted by the General Assembly in 1995, provides that "[n]othing in the [VHCA] shall apply to qualifying transportation facilities undertaken pursuant to the authority of this chapter."  Code § 56-574.  Although the VHCA authorized the SCC to have regulatory jurisdiction generally over transportation facilities, the PPTA carved out an exception for qualifying transportation facilities undertaken pursuant to the PPTA.  Id.; see also Code § 56-560.

We hold that neither the Constitution of Virginia nor the Code supplies the SCC with jurisdiction over toll rate setting in projects authorized by the PPTA.  The General Assembly was therefore not required to delegate any legislative power employed in the execution of the Project exclusively to the SCC.

D.    Whether Extending the Legislative Power to Impose and Set the Rates of User Fees to VDOT and ERC Was Constitutional

We now turn to the constitutionality of the legislative power to impose and set the rates of user fees being extended to VDOT and ERC.[4]  At all times in the discussion below, unless

---

[4] The issue of the legislative power to impose and set the rates of user fees being extended to VDOT and ERC is one of Virginia constitutional law, and one resolved by state-law principles.  This Court has, over time, looked to federal law to help provide guiding principles or to exemplify a point.

otherwise indicated, the "legislative power" specifically being addressed is the power to impose user fees in the form of tolls and the power to set the rates of those tolls.

In addressing this issue, we are not evaluating—and indeed cannot speak to—the merits of the various policy decisions underlying this case. Our role is simply to ascertain whether the political entities have acted within the constitutional boundaries that limit the exercise of their governmental power. If so, then their policy decisions are subject to, and properly evaluated by, the political will of the people, and we have no authority to override such political decisions. See Williamson v. Old Brogue, Inc., 232 Va. 350, 354, 350 S.E.2d 621, 624 (1986) ("Where, as here, the issue involves many competing economic, societal, and policy considerations, legislative procedures and safeguards are particularly appropriate to the task of fashioning an appropriate change."); Commonwealth v. County Board, 217 Va. 558, 581, 232 S.E.2d 30, 44 (1977) ("Conscious of the respective roles of the General Assembly and

---

See, e.g., DuVal v. Virginia Elec. & Power Co., 216 Va. 226, 228-29, 217 S.E.2d 844, 846-47 (1975) (discussing American Power & Light Co. v. Securities & Exch. Comm'n, 329 U.S. 90 (1946)). Resolving the constitutional propriety of extending state legislative power to both public and private entities, however, is a state-law issue not compelled by, or necessarily coextensive with, federal jurisprudence. See Michigan v. Long, 463 U.S. 1032, 1040-41 (1983).

the judiciary, we decline to intrude upon . . . a singularly political question."  (internal quotation marks omitted)).

Evaluating the extension of legislative power to VDOT and ERC requires resolving two issues.  First, whether extending the legislative power to VDOT and ERC is constitutionally permissible.  Second, if such an extension of the legislative power is constitutional, whether that extension was done correctly.  We address these points in turn.

1.   The Legislative Power to Impose and Set the Rates of User Fees May Be Constitutionally Extended to VDOT and ERC

The Legislative, Executive, and Judicial Branches are "separate and distinct" under the Constitution of Virginia.  Va. Const. art. I, § 5; Va. Const. art. III, § 1.  This directive "prevents one branch from engaging in the functions of another."  Taylor v. Worrell Enterprises, Inc., 242 Va. 219, 221, 409 S.E.2d 136, 138 (1991); see, e.g., Board of Supervisors v. Allman, 215 Va. 434, 445, 211 S.E.2d 48, 55 (1975) (courts cannot rezone property because the "classification of lands under zoning ordinances involves the exercise of the legislative power" of the Commonwealth); Fugate v. Weston, 156 Va. 107, 116-17, 157 S.E. 736, 739 (1931) (the General Assembly cannot vest the Governor with the power to suspend or remove an officer without subsequent judicial adjudication because "the requisite jurisdictional facts

necessary to sustain [such an action] is always essentially a judicial function").  Therefore, because "[t]he legislative power of the Commonwealth" is "vested in a General Assembly," Va. Const. art. IV, § 1, the General Assembly is the branch of government that wields legislative power.

However, we have long recognized that the separation of powers between the branches of government is not absolute. See, e.g., Thompson v. Smith, 155 Va. 367, 381, 154 S.E. 579, 584 (1930).  Practical considerations of modern governance require some degree of intermixing governmental powers between branches.  See Baliles v. Mazur, 224 Va. 462, 472, 297 S.E.2d 695, 700 (1982) ("[T]here is not a single constitution of any state in the [U]nion which does not practically embrace some acknowledgement of the [separation of powers] maxim and at the same time some admixture of powers constituting an exception to it." (internal quotation marks omitted)).  This is particularly true in the area of the Executive Branch's administration and enforcement of law enacted by the General Assembly.  As we have acknowledged, "[g]overnment could not be efficiently carried on if something could not be left to the judgment and discretion of administrative officers to accomplish in detail what is authorized or required by law in general terms."  Thompson, 155 Va. at 379, 154 S.E. at 584.

a. The General Assembly Can Delegate to VDOT the Legislative Power to Impose and Set the Rates of User Fees

We first evaluate the General Assembly's extension of the legislative power to impose and set the rates of user fees to VDOT under the PPTA. This extension of legislative power is that most commonly encountered in modern governance, and is easily categorized as a delegation of legislative power to VDOT. For the reasons set forth below, we hold that this delegation of legislative power to VDOT is constitutionally permissible.

The General Assembly's legislative powers are "without limit," restricted only by express or necessarily implied prohibitions arising from the Constitution of Virginia or the United States Constitution. Marshall v. Northern Virginia Transp. Auth., 275 Va. 419, 432, 657 S.E.2d 71, 78 (2008); Harrison, 201 Va. at 396, 111 S.E.2d at 511. In the exercise of its broad, plenary power, the General Assembly can generally delegate its legislative powers to Executive Branch administrative agencies such as VDOT. Taylor, 242 Va. at 221, 409 S.E.2d at 137-38. Some types of legislative powers, however, are removed from this broad authority and cannot be freely delegated. When determining whether a particular legislative power can be delegated to an administrative agency, this Court "consider[s] the explicit language of the

29

Constitution [of Virginia]." Marshall, 275 Va. at 432, 657 S.E.2d at 78. Meeks makes two arguments as to why the General Assembly's delegation of the legislative power to impose and set the rates of user fees to VDOT is constitutionally infirm.

First, Meeks argues that the Project tolls are taxes. If the Project tolls were taxes, then the General Assembly's delegation of the power to impose and set the rates of such taxes to VDOT would be a constitutionally impermissible delegation of legislative power. Id. at 435, 657 S.E.2d at 79–80. But as discussed extensively above in Part II.B., the Project tolls are not taxes. The Project tolls are user fees. The constitutional prohibition against delegating the legislative power to impose and set the rates of taxes does not apply to the legislative power to impose and set the rates of user fees.

Second, Meeks argues that the power to impose and set the rates of the Project tolls is a wholly legislative function that can only be delegated to the SCC and not to an Executive Branch administrative agency like VDOT. But as discussed extensively above in Part II.C., the SCC is not the only entity to which the legislative power to impose and set the rates of user fees can be delegated. The mere existence of the SCC does not create a constitutional barrier prohibiting the General

Assembly from delegating the legislative power to impose and set the rates of user fees to an administrative agency.

Thus considered, the General Assembly is not prohibited by either the Constitution or the Code from delegating the legislative power to impose and set the rates of user fees to the administrative agency VDOT.

b.    The General Assembly Can Empower ERC to Assist VDOT in Exercising the Legislative Power to Impose and Set the Rates of User Fees

We now evaluate the General Assembly's extension of the legislative power to impose and set the rates of user fees to ERC.  This extension of legislative power is different than a typical delegation of legislative power to an administrative agency, but is implicated here by the PPTA.  For the reasons set forth below, this extension of the legislative power to ERC (an "empowerment") is of a different kind than the extension of the legislative power to VDOT (a "delegation").

When the General Assembly delegates a legislative power directly to a private entity, "[t]his is legislative delegation in its most obnoxious form."  Carter v. Carter Coal Co., 298 U.S. 238, 311 (1936).  The Supreme Court of the United States has held that when Congress delegates its legislative power to regulate an aspect of a specific industry to a private entity engaged in that very industry, that delegation offends the United States Constitution.  Id. at 310-12 (Congress cannot

31

delegate power to "fix maximum hours of labor" in the coal-mining industry to specified coal producers). But a private entity's mere involvement with making regulatory decisions, falling below actual delegation of legislative power, is not itself unconstitutional. For example, if Congress empowers a private entity to help regulate an aspect of a specific industry, but that private entity's authority is subordinate to a public entity's decision-making power, then the empowerment is constitutionally permissible. Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 388, 399 (1940) (Congress can empower private entities to "propose minimum prices pursuant to prescribed statutory standards" because those proposals were subject to the National Bituminous Coal Commission's approval).

Our previous decisions align with these principles. See, e.g., County of Fairfax v. Fleet Indus. Park Ltd. P'ship, 242 Va. 426, 432-33, 410 S.E.2d 669, 672-73 (1991) (holding that a legislative enactment, allowing private landowners to unilaterally veto zoning classifications as well as ordinances and regulations affecting property, was an impermissible delegation of legislative power because it gave the private parties "total discretion"); Chesapeake & Potomac Tel. Co. of Virginia v. Arlington Cnty., 213 Va. 339, 341, 192 S.E.2d 772, 774 (1972) (holding that a private telephone company's increased rates, when never properly authorized by the SCC,

32

"were company-made rates and increases" that violated both Virginia constitutional and statutory provisions).  We therefore make explicit that, under the Constitution of Virginia, the General Assembly may _empower_ private entities to assist public entities in the exercise of constitutionally-delegated legislative powers, but the General Assembly cannot _delegate_ such legislative powers directly to private entities.[5]

With these governing principles in mind, the PPTA is reviewed to determine whether ERC's involvement "in the administrative process" has become so prominent and without sufficient VDOT oversight that ERC's "role [has] trespass[ed] into an unconstitutional delegation."  Association of Am. R.R. v. United States Dep't. of Transp., 721 F.3d 666, 671 (D.C. Cir. 2013).  In the PPTA, the General Assembly extended

---

[5] This divide between delegation and empowerment is encapsulated in our previous decisions regarding when a legislative power has been impermissibly delegated to the private sector.  However, we borrow the term "empower" as a means of contrasting a "delegation" from a related delegation context.

In Ex Parte Bassitt, 90 Va. 679, 680 (1894), we evaluated the General Assembly's extension of the legislative power to appoint additional judicial officers between elections, if "the public service" so required, to county courts.  We held that this extension of power was not a delegation of legislative power.  Id. at 681.  Instead, we recognized that "the county courts [were] merely empowered to declare the event . . . upon which the act is to take effect within their respective counties."  Id. (emphasis added).  Thus, we recognized that the General Assembly can empower other entities to be involved in the exercise of legislative power, but such empowerment falls short of a delegation of legislative power.

directly to ERC some degree of authority to be involved with the legislative power to impose and set the rates of user fees. See, e.g., Code § 56-565(D) (allowing a private entity to make different "classifications" for assessing user fees); Code § 56-566(A) (directing VDOT and ERC to "enter into a comprehensive agreement"); Code § 56-566(B) (requiring a comprehensive agreement to "provide for such user fees" that the parties establish "from time to time by agreement," and for the parties to "negotiat[e] user fees").  The PPTA, then, does allow ERC to have a role regarding the legislative power.  But that role is subordinate to VDOT's ultimate decision-making authority.

Indeed, the comprehensive agreement which dictates the exercise of the legislative power to impose and set the rates of user fees is subject to VDOT's approval.  Nothing in the PPTA compels VDOT to enter into a comprehensive agreement containing terms to which VDOT does not assent.  This means that VDOT has the option of ultimately rejecting the comprehensive agreement and looking for another proposal submitted by a different private entity.  Such a rejection could be, amongst other reasons, because of the private entity's unwillingness to submit to VDOT's determination regarding user fees.

34

Meeks is correct in asserting that the Comprehensive Agreement, being a contract, must be made while VDOT and ERC stand on relatively equal footing as a matter of contract principles. See Envirotech Corp. v. Halco Eng'g, Inc., 234 Va. 583, 593, 364 S.E.2d 215, 220 (1988) (holding that "grossly unequal bargaining power at the time the contract is formed" can render a contract unconscionable). But VDOT retains the ultimate authority governing the progress of any given project by deciding which particular comprehensive agreement will be controlling. This power to reject a comprehensive agreement carries with it the power to shape the terms of the comprehensive agreement, including those terms relating to the legislative power to impose and set the rates of user fees.

It is clear, then, that VDOT holds the ultimate power to establish the terms of a comprehensive agreement under the PPTA. This includes those terms regarding the exercise of the legislative power. The General Assembly does allow private entities such as ERC to contract and negotiate with VDOT in deciding what those terms are. But ERC has no ability to force VDOT to actually enter into such a comprehensive agreement. The General Assembly has therefore only empowered ERC, and has not delegated the legislative power to impose and set the rates of user fees to ERC. Thus considered, the General Assembly can constitutionally extend the legislative power to ERC, as a

35

private entity, to assist VDOT in imposing and setting the rates of user fees, because here it is a mere empowerment and not a delegation of legislative power.

   c.   VDOT Can Authorize ERC to Be Involved in the Exercise of the Legislative Power to Impose and Set the Rates of User Fees

We finally evaluate VDOT's extension of the legislative power to impose and set the rates of user fees to ERC.  This extension of legislative power is unique to the public entity/private entity collaboration context, and is implicated here by VDOT having authorized, through contract, ERC to exercise some degree of the legislative power in the Comprehensive Agreement.  For the reasons set forth below, this extension of the legislative power to impose and set the rates of user fees is only a mere empowerment and not a delegation.

The principles pertaining to the delegation/empowerment dichotomy are equally applicable here.  This is true even though the schemes in the cases setting forth those principles are not directly on point.  In contrast to the aforementioned cases, the current issue is not whether the General Assembly, through the PPTA, has directly delegated to or empowered ERC to engage in the exercise of legislative power.  The issue is whether VDOT, having been delegated the legislative power to impose and set the rates of user fees by the General Assembly,

36

may subsequently authorize ERC, through contract, to exercise a degree of that legislative power.

Despite these factual differences, the two schemes parallel one another. That is, VDOT's authorizing ERC to exercise the legislative power is substantially similar to the scenario of the General Assembly's directly delegating to a private entity, or empowering a private entity with, a legislative power. In fact, because the General Assembly delegated the legislative power to VDOT, VDOT's authorizing ERC to exercise that legislative power can be fairly described as being done on the General Assembly's behalf. It would be a poor check on impermissible delegation if administrative agencies could extend legislative powers in a manner in which the General Assembly could not. See Marshall, 275 Va. at 435, 637 S.E.2d at 80 ("The General Assembly also may not accomplish . . . indirectly[] that which it is not empowered to do directly.").

The issue here is therefore sufficiently comparable to a scenario in which the General Assembly directly delegates a legislative power to a private entity or empowers a private entity with a legislative power. We therefore make explicit that, under the Constitution of Virginia, an administrative agency may empower private entities (through contractual arrangements) to assist it in the exercise of constitutionally-

37

delegated legislative powers, but an administrative agency cannot <u>delegate</u> such legislative powers to private entities.

As with the PPTA, then, the Comprehensive Agreement is reviewed to determine whether ERC's involvement "in the administrative process" has become so prominent and without sufficient VDOT oversight that ERC's "role [has] trespass[ed] into an unconstitutional delegation." <u>American R.R.</u>, 721 F.3d at 671. The Comprehensive Agreement makes clear that ERC does not exercise unilateral discretion in imposing and setting the rates of the user fees. True, ERC has the "exclusive right" and "obligation" to impose and establish the Project tolls. But that power must conform to the other terms of the Comprehensive Agreement.

The Comprehensive Agreement requires the Project tolls to be set and raised in accordance with the Toll Rate Schedule. The Toll Rate Schedule—a document which VDOT negotiated with ERC, and which VDOT could have rejected—sets maximum transponder and non-transponder rates. So ERC's ability to exercise the legislative power to impose and set the rates of user fees is confined by limits which VDOT has expressly created by setting maximum toll rates. Moreover, ERC must give VDOT notice 60 days before any planned Project toll rate adjustment. VDOT therefore retains constant oversight of ERC's exercise of the legislative power to impose and set the rates

38

of user fees.  In addition, VDOT retains the right, "in its sole discretion," to immediately stop the imposition of Project tolls in certain emergencies.

ERC's ability to impose and set the rates of the Project tolls is more than merely advisory.  But VDOT retains a pervasive role in setting the limits on, and constantly reviewing, ERC's use of the legislative power.  This makes ERC's ability to exercise the legislative power sufficiently subordinate to VDOT's decision-making authority for purposes of determining whether VDOT can authorize ERC to exercise some degree of that legislative power.  See American R.R., 721 F.3d at 671 n.5 (reviewing multiple federal circuit court decisions that evaluated regulatory schemes involving private entities and holding that the defining characteristic making such schemes constitutionally permissible was that "a private party [did not] stand on equal footing with a government agency").

This determination is confirmed by Harrison, where we were presented with the General Assembly's creation of the Virginia State Ports Authority and delegation to the Ports Authority the legislative power "to fix and revise charges for the use of the port facilities under its control."  202 Va. at 977, 121 S.E.2d 622.  The Ports Authority subsequently entered into a contract which, in part, leased a facility to a private railroad company.  Id. at 970, 977, 121 S.E.2d at 617, 622.  A provision

39

of this lease contracted away to the private railroad company the power to fix and enforce "the rates and regulations" for use of the leased facility, a legislative power originally delegated to the Ports Authority.  Id. at 977, 121 S.E.2d at 622.  Under that lease contract, the railroad company's rates and regulations were presumptively valid unless an unspecified "governmental body" determined those rates and regulations "to be unfair or unlawful."  Id.  In reviewing a challenge of this contractual situation as being "an unlawful delegation of the [Ports] Authority's responsibility" to a private entity, we observed that "[t]he General Assembly obviously did not think so," and simply held that "there is no substance to the point." Id. at 978, 121 S.E.2d at 622.

Such a summary dismissal of an identical challenge confirms the constitutionality of VDOT's authorizing ERC, through contract, to exercise the legislative power to impose and set the rates of user fees.  The Harrison situation is analogous to the Comprehensive Agreement between VDOT and ERC. If anything, VDOT's confining the universe of ERC's potential actions with hard limits and continuing supervision of ERC's ability to adjust the Project tolls provides a greater degree of public entity oversight than that which existed in Harrison.

Thus considered, in the Comprehensive Agreement VDOT can authorize ERC to exercise the legislative power to impose and

set the rates of user fees—a legislative power originally delegated from the General Assembly to VDOT—because here it is a mere empowerment and not a delegation of legislative power.

2.    The Extension of the Legislative Power to Set User Fees Was Appropriately Accomplished

a.    The General Assembly Delegated the Legislative Power to VDOT with Constitutionally Sufficient Policies and Standards

The General Assembly's ability to delegate its legislative power is not absolute.  A delegation of legislative power allowing for discretionary exercise of that power is not, in and of itself, constitutionally impermissible.  See DuVal, 216 Va. at 228, 217 S.E.2d at 846.  However, "delegations of legislative power are valid only if they establish specific policies and fix definite standards to guide the official, agency, or board in the exercise of the power."  Bell v. Dorey Elec. Co., 248 Va. 378, 380, 448 S.E.2d 622, 623 (1994).  Absent such policies and standards, a delegation of legislative power is unconstitutional.  Id.

Constitutionally sufficient policies and standards are those "where the terms or phrases employed have a well understood meaning, and prescribe sufficient standards to guide the administrator."  Id. at 382, 448 S.E.2d at 624 (citation omitted).  The standards "must be as reasonably precise as the subject matter requires or permits."  Ours Props., Inc. v. Ley, 198 Va. 848, 851, 96 S.E. 754, 757 (1957).  But, general terms

41

are permissible if those terms "get precision from the technical knowledge or sense and experience of men and thereby become reasonably certain."  Id. at 852, 96 S.E.2d at 757.[6]

The legislative power at issue is the ability to impose and set the rates of user fees.  VDOT is correct in declaring that this is a "matter[] of detail [that] may properly be left to administrative discretion."  Thompson, 155 Va. at 381, 154 S.E. at 584.  But this could not excuse a lack of constitutionally sufficient policies and standards, as VDOT argues.  It is because VDOT can exercise administrative discretion in the exercise of a delegated legislative power that constitutionally sufficient policies and standards governing that discretion are required.  Id.

---

[6] Meeks asserts that a delegation of legislative power, when the General Assembly contemplates that power to be shared to some degree with a private entity, must be accompanied by policies and standards that are even more precise than generally required.  No authority supports this proposition. This proposition does not align with the purposes of requiring specific policies and standards.  See Yakus v. United States, 321 U.S. 414, 426 (1944) ("[S]tandards [must be] sufficiently definite and precise to enable Congress, the courts[,] and the public to ascertain whether the [administrative agency] has conformed to those standards."); Chapel v. Commonwealth, 197 Va. 406, 410, 89 S.E.2d 337, 340 (1955) (holding that standards to guide administrative discretion ensure that the General Assembly does not "divest itself of [the] function" to "determine and declare what the law shall be").  Such a proposition would further confuse an already murky jurisprudential area to the point of removing any real standards for a reviewing court to apply.  We therefore reject this proposition.

42

Therefore, we must evaluate those sources that might establish such policies and standards. For this inquiry, VDOT invokes both federal law and judicially imposed limitations on the exercise of the legislative power to impose and set the rates of user fees. But we look no further than the operative legislation: the PPTA itself. See Volkswagen of Am., Inc. v. Smit, 279 Va. 327, 340, 689 S.E.2d 679, 687 (2010) ("[T]he legislature may delegate discretion to an administrative officer to determine the specifics of how a statute is to be enforced, but the legislature must declare the policy of the law and fix the legal principles which are to control in given cases." (emphasis added) (internal quotation marks and alteration omitted)).

In fact, our review begins and ends with Code § 56-566(B). Code § 56-566(B) directs the comprehensive agreement to set forth the terms of imposing and setting the rates of user fees. In particular, specific guidance is provided for when parties are "negotiating user fees under this section." Code § 56-566(B). That guidance commands that "the parties shall establish [user] fees that are the same for persons using the facility under like conditions except as required by agreement between the parties to preserve capacity and prevent congestion on the qualifying transportation facility." This consideration governs any exercise of the legislative power to impose or set

43

the rates of user fees.[7]  Further, this consideration requires

VDOT to consider whether the imposition and rates of the user

fees will preserve capacity and prevent congestion.  By the

terms of Code § 56-566(B), then, VDOT's exercise of the

legislative power is guided by the directive to preserve

capacity and prevent congestion.

Moreover, terms such as "capacity" and "congestion" are

industry-specific goalposts.  We have long held such standards

to be constitutionally sufficient.  See Reynolds v. Milk Comm'n

of Virginia, 163 Va. 957, 965, 975, 179 S.E. 507, 509-10, 514

(1935) (upholding a statute allowing the Milk Commission to fix

reasonable prices, whereby reasonableness is informed by

industry-specific costs, charges, and prices).

Thus considered, we hold that Code § 56-566(B) provides

constitutionally sufficient policies and standards to govern

the exercise of the legislative power: both the power to impose

---

[7] This clause appears to be conditioned on the "agreement
between the parties."  Code § 56-566(B).  However, we read "to
preserve capacity and prevent congestion on the qualifying
transportation facility" as being a constant consideration that
must be addressed by VDOT in the exercise of the legislative
power to impose and set the rates of user fees.  See Copeland
v. Todd, 282 Va. 183, 193, 715 S.E.2d 11, 16 (2011) ("[W]e have
a duty to construe statutes subject to a constitutional
challenge in a manner that avoid[s] any conflict with the
Constitution." (internal quotation marks omitted)).

The agreement of the parties—that is, the Comprehensive
Agreement which sets forth all aspects of exercising the
legislative power—merely serves as the vehicle through which
that consideration is addressed.

user fees and the power to set the rates of user fees.  These policies and standards are sourced in the mandatory requirement that VDOT exercise the legislative power in order "to preserve capacity and prevent congestion."  Code § 56-566(B).  We need not evaluate whether other considerations within Code § 56-566(B) supply constitutionally sufficient policies and standards.  The General Assembly's mandatory guidance that VDOT's exercise of the legislative power to impose and set the rates of user fees shall preserve capacity and prevent congestion, standing alone, provides sufficient policies and standards to satisfy the constitutional requirement discussed here.  On this point, the circuit court erred.

> b.    ERC Being Empowered, and Not Delegated To, Does Not Require Accompanying Policies and Standards

The requirement of constitutionally sufficient policies and standards is one that accompanies the delegation of legislative power.  See Volkswagen of America, 279 Va. at 339-40, 689 S.E.2d at 686.  Such a requirement does not extend to the empowerment of a private entity to be involved in the exercise of a legislative power.

As discussed above in Part II.D.1.b., the General Assembly did not delegate the legislative power to impose and set the rates of user fees to ERC, but only empowered ERC to assist VDOT through the PPTA.  And as discussed above in Part

45

II.D.1.c., VDOT did not delegate that legislative power to ERC, but merely empowered ERC to assist VDOT in the Comprehensive Agreement.  As such, because ERC has not been delegated a legislative power, no requirement exists that constitutionally sufficient policies and standards must accompany ERC's empowerment.

E.    Whether the Comprehensive Agreement Unconstitutionally Abridges the Commonwealth's Police Power

We now address Meeks' final argument assailing the constitutionality of the Project: that the Project has abridged the Commonwealth's police power.

The Constitution of Virginia declares that the "police power of the Commonwealth . . . shall never be abridged."  Va. Const. art. IX, § 6.  The "police power," has "no exact definition."  Blue Cross of Va. v. Commonwealth, 221 Va. 349, 358, 269 S.E.2d 827, 833 (1980).  However, the police power is best described as the Commonwealth's inherent power, as a sovereign, to enact laws "to promote the health, peace, morals, education[,] and good order of the people, and to legislate so as to increase the industries of the State, develop its resources, and add to its wealth and prosperity."  Mumpower v. Housing Auth. of Bristol, 176 Va. 426, 440, 11 S.E.2d 732, 737 (1940) (emphasis and internal quotation marks omitted).  The Commonwealth's police power is abridged when the government can

46

no longer use its discretion in exercising this governmental power.  See, e.g., Nusbaum v. Norfolk, 151 Va. 801, 807-08, 145 S.E. 257, 259 (1928) (holding that if an ordinance, embodying the discretionary exercise of governmental power, could not be repealed, it would abridge the Commonwealth's police power).

Meeks asserts that certain terms in the Comprehensive Agreement have the effect of abridging the Commonwealth's police power.  These terms include: that the Project shall continue for 58 years; that ERC can assert claims for damages if certain specified events occur, including the construction or expansion of a facility that would have an impact on the Project and the imposition of certain state and local taxes; that VDOT must "stand behind" the $422,000,000 federal TIFIA loan to ERC; and that ERC can impose and collect the Project's tolls in accordance with the toll rate formula.  In short, Meeks contends that these terms prevent the Commonwealth from responding to changing circumstances throughout the duration of the Comprehensive Agreement.

We start with the understanding that the grant of authority to public entities in Code § 56-566 to enter into a comprehensive agreement is necessarily limited by the prohibition against any abridgment of the police power of the Commonwealth, as set forth in Article IX, § 6 of the Constitution of Virginia.  See Copeland v. Todd, 282 Va. 183,

47

193, 715 S.E.2d 11, 16 (2011).  Thus, Code § 56-566 cannot be construed to empower public entities to abridge the Commonwealth's police power.  Compare Victoria v. Victoria Ice, Light & Power Co., 134 Va. 134, 144-46, 155, 114 S.E. 92, 95-96, 98 (1922) (holding that a statutory grant of power to municipalities to enter into contracts to fix the rates of public service corporations was necessarily limited by the constitutional prohibition of abridging the Commonwealth's police powers).  However, that limitation on Code § 56-566 does not limit VDOT's basic ability to enter into contracts with private entities.  Indeed, it is a longstanding rule that the Commonwealth and certain of its agencies, boards, and commissions, that is the "arms" of the Commonwealth, can enter contracts with private entities.[8]  See South Hampton Apartments, Inc. v. Elizabeth City Cnty., 185 Va. 67, 79, 37 S.E.2d 841,

---

[8] An "arm" of the Commonwealth is a description that has been used in referring to certain of its agencies and commissions. See Jean Moreau & Assocs. v. Health Ctr. Comm'n, 283 Va. 128, 141, 720 S.E.2d 105, 112 (2012) (explaining that "whether an entity is an arm or agency of the State . . . depends on the nature of the entity"); County of York v. Peninsula Airport Comm'n, 235 Va. 477, 481 n.1, 369 S.E.2d 665, 667 n.1 (1988) (observing that an entity that is "not an arm of the Commonwealth, still may be a municipal corporation (and, thus, a political subdivision)"); Prendergrast v. Northern Va. Reg. Park Auth., 227 Va. 190, 194, 313 S.E.2d 399, 401 (1984) (explaining that "the attributes of the particular entity . . . must be examined to determine whether it is an 'arm' of the Commonwealth").

48

847 (1946) (counties); Tait v. Central Lunatic Asylum, 84 Va. 271, 277, 4 S.E. 697, 700 (1888) (the Commonwealth).

So the mere fact that VDOT agrees to abide by the terms of the Comprehensive Agreement does not abridge the Commonwealth's police power. Moreover, these particular terms do not "bind [VDOT or the Commonwealth] by contract not to exercise [its police powers] from time to time as the public good may require." Roanoke Gas Co. v. City of Roanoke, 88 Va. 810, 830, 14 S.E. 665, 672 (1892). The Comprehensive Agreement must be read as a whole as the embodiment of VDOT's determination of how to exercise the Commonwealth's police powers. This determination includes when not to exercise those police powers, as outlined by certain terms of the Comprehensive Agreement. VDOT, by merely entering into the Comprehensive Agreement, has not abridged the Commonwealth's police power. Compare Concerned Residents of Gloucester Cnty. v. Board of Supervisors, 248 Va. 488, 499-500, 449 S.E.2d 787, 793-94 (1994) (holding that Gloucester County could permissibly enter into a 20-year lease, which had the potential to impact the "future prerogatives" of the county, because the General Assembly explicitly authorized Gloucester County to do so without prescribing the precise terms of such a contract).

Meeks' argument evolves to challenge that it is not the substantive obligations of the Comprehensive Agreement that

49

abridge the Commonwealth's police power, but the mere threat of the resulting breach of contract damages. In a related context, we held that neither monetary costs of contractual performance, nor monetary liability from breaching a contract, constituted a "bartering away of [a county's] legislative powers." Id. at 494-95, 500, 449 S.E.2d at 791, 794. Similarly, the fact that the Comprehensive Agreement requires VDOT to pay costs or holds VDOT liable for monetary damages in light of a breach does not abridge the Commonwealth's police power.[9]

The Comprehensive Agreement contains an additional term which further underscores how any monetary obligation arising from the Comprehensive Agreement does not abridge the Commonwealth's police power. The Comprehensive Agreement provides that the payment of any "damages, losses[,] or any other amounts due and owing by [VDOT]" shall be "subject to appropriation by the General Assembly." The specter of monetary liability is one conditioned on the General Assembly's consent. The General Assembly can therefore decide not to

---

[9] Meeks argues that the Comprehensive Agreement contains terms that amount to an impermissible penalty. See Boots, Inc. v. Singh, 274 Va. 513, 517, 649 S.E.2d 695, 697 (2007). We will not address this point. Neither a breach nor a particular monetary obligation has been alleged for us to evaluate. At any rate, penalties are unenforceable. See id.

appropriate the required funds if such a monetary obligation were ever to actually abridge the Commonwealth's police power.[10]

We therefore hold that the Commonwealth's police power has not been abridged by VDOT's entering into the Comprehensive Agreement with ERC, by the substantive terms of the Comprehensive Agreement, or by the monetary obligations arising from performance or breach of the Comprehensive Agreement.

### III. Conclusion

For the aforementioned reasons, we hold that the Project tolls are user fees and not taxes.  Therefore, the General Assembly did not delegate its power of taxation to agencies such as VDOT in violation of Article IV, § 1 of the Constitution of Virginia.  We also hold that General Assembly properly delegated to VDOT the legislative power to impose and set the rates of user fees in the form of tolls, and that this legislative power was not impermissibly delegated to ERC.  Finally, we hold that the Comprehensive Agreement does not abridge the Commonwealth's police power.  We will not reach VDOT's and ERC's argument that the circuit court erred in refusing to grant a stay because the

---

[10] We decline to consider the pure speculation that the General Assembly would pay a monetary obligation arising from the Comprehensive Agreement at the expense of abridging the Commonwealth's police power.  Also, the fact that the General Assembly must weigh the practical consequences of a decision not to appropriate funds, such as any impact on the Commonwealth's credit rating, does not counsel us to entertain the supposition that the General Assembly will abridge the Commonwealth's police power.

51

publication of this opinion renders the issue moot.  We will therefore reverse the judgment of the circuit court and enter final judgment in favor of VDOT and ERC.

<u>Reversed and final judgment.</u>

JUSTICE McCLANAHAN, concurring.

I write separately for two reasons.  First, while I concur with the Court's disposition in Part B, I would apply this Court's "determinative" test, not Massachusetts law.  Second, I do not join Parts II.D.1.b., II.D.1.c., and II.D.2.b. because they offend the Rules of this Court by reviewing an issue that was not decided by the circuit court and that is outside the scope of any party's assignments of error.

I agree with the majority's conclusion in Part II.B. that the toll is a user fee, but I believe the conclusion derives solely from the Court's existing precedent distinguishing taxes and user fees.  <u>Mountain View Ltd. P'ship v. City of Clifton Forge</u>, 256 Va. 304, 312, 504 S.E.2d 371, 376 (1998); <u>Tidewater Ass'n of Homebuilders, Inc. v. City of Virginia Beach</u>, 241 Va. 114, 121, 400 S.E.2d 523, 527 (1991); <u>McMahon v. City of Virginia Beach</u>, 221 Va. 102, 107-08, 267 S.E.2d 130, 134 (1980); <u>see also</u> <u>Eagle Harbor, L.L.C. v. Isle of Wight Cty.</u>, 271 Va. 603, 612-15, 628 S.E.2d 298, 303-04 (2006).  An exaction is a tax if it was adopted "solely as a revenue measure," and an exaction was not adopted "solely as a revenue

52

measure" if "'there [existed] a reasonable correlation between the benefit conferred and the cost exacted.'" Eagle Harbor, 271 Va. at 613, 615, 628 S.E.2d at 303-04 (quoting McMahon, 221 Va. at 107-08, 267 S.E.2d at 133-34, and Mountain View, 256 Va. at 312, 504 S.E.2d at 376). As the Court has made clear, "[t]he reasonable correlation test . . . . is determinative of whether a fee enacted . . . is a permissible exercise of [a governing body's] police power as opposed to an impermissible revenue-producing device in the form of a [tax]." Id. at 615, 628 S.E.2d at 304 (emphasis added). Because our precedent provides a test "determinative" of the issue in Part II.B., I do not agree with the majority's reliance on Massachusetts law to adjudicate a case arising under the Constitution of Virginia. Instead, because the evidence shows a reasonable correlation between the tolls imposed on motorists at each transportation facility and the resulting benefit of improved traffic conditions realized by motorists at each transportation facility, I would hold that under Virginia law the toll is not a tax.

In Part II.D., the majority creates a dichotomy between delegation of legislative power to a private entity and mere "empowerment" of such an entity, in support of the view that the General Assembly did not delegate toll-setting authority to ERC either directly (Part II.D.1.b.) or indirectly through VDOT

53

(Part II.D.1.c.). The circuit court, however, held only that there was an unconstitutional delegation of power to VDOT, not to ERC:

> [T]he General Assembly has given unfettered power to the Virginia Department of Transportation to set toll rates without any real or meaningful parameters in violation of Article IV, § 1 of the Constitution of Virginia.

Under Rule 5:17(c)(1), this Court does not review decisions the lower court did not render. See, e.g., Paugh v. Henrico Area Mental Health & Developmental Servs., 286 Va. 85, 87 n.1, 743 S.E.2d 277, 278 n.1 (2013) (refusing to entertain appeal of a decision the circuit court did not make).

Given that the circuit court's holding was specific to VDOT, the parties naturally assigned error to the holding that the General Assembly unconstitutionally delegated authority to VDOT, not ERC.[1] Notwithstanding the absence of an assignment of

---

[1] For example, ERC's relevant assignment of error clearly concerned delegation of power only to VDOT:

> The trial court erred in holding that the General Assembly unconstitutionally delegated toll-setting authority to VDOT.

And even the appellees' assignment of cross-error, in which they proposed an alternative basis for the circuit court to have granted summary judgment in their favor, did not contend that the General Assembly delegated power to ERC:

> The Circuit Court erred by not granting summary judgment to Appellees . . . on the alternative ground that exacting a rate of return on private investment . . . through tolls . . . is an exclusively

54

error implicating delegation of authority to ERC, the majority discusses the issue at length.  <u>See</u> Rule 5:17(c)(1)(i) ("Only assignments of error assigned in the petition for appeal will be noticed by this Court.")

Because the majority's discussion of whether the General Assembly delegated toll-setting authority to ERC violates the Rules of Court by reviewing an issue that the circuit court did not decide and that is outside the scope of any party's assignment of error, I do not join Parts II.D.1.b., II.D.1.c., and II.D.2.b.[2]

---

legislative function that was unconstitutionally exercised by, or unconstitutionally delegated to, VDOT.

[2] Moreover, even if it were not a violation of our Rules of Court to engage in the discussion set out in Part II.D. of the majority opinion, I note that the delegation and "empowerment" dichotomy finds no legal basis in this Court's precedent, misinterprets as support the United States Supreme Court's decision in <u>Sunshine Anthracite Coal Co. v. Adkins</u>, 310 U.S. 381 (1940), and unnecessarily complicates the Court's jurisprudence by stamping a new legal label of "empowerment" on any private entity's mere proposal of contract terms to the Commonwealth, which the Commonwealth is free to accept or reject.  I would adhere to the traditional, straightforward dichotomy: Legislative power has either been delegated or it has not.